**DYKEMA GOSSETT LLP**
ABIRAMI GNANADESIGAN, State Bar No. 263375
*AGnanadesigan@dykema.com*
444 South Flower Street, Suite 2200
Los Angeles, California 90071
Telephone: (213) 457-1800
Facsimile: (213) 457-1850

Attorneys for Defendant
JPMORGAN CHASE BANK, N.A.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JOSHUA JOHNSON,<br><br>       Plaintiff,<br><br>    v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>       Defendant. | Case No. 2:22-cv-06718-AB-MAAx<br><br>The Hon. André Birotte Jr.<br>Courtroom 7B<br><br>Magistrate Judge Maria A. Audero<br>Courtroom: 690<br><br>**DECLARATION OF ABIRAMI GNANADESIGAN IN SUPPORT OF DEFENDANT JPMORGAN CHASE BANK, N.A.'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF THOMAS TARTER**<br><br>**Date:** **January 30, 2026**<br>**Time:** **10:00 AM**<br>**Location:** **Dept 7B**<br><br>Complaint Filed:   September 19, 2022 |

**DYKEMA GOSSETT LLP**
444 SOUTH FLOWER STREET
SUITE 2200
LOS ANGELES, CALIFORNIA 90071

008241.002262 4913-4493-4021.2

1

DYKEMA GOSSETT LLP
444 SOUTH FLOWER STREET
SUITE 2200
LOS ANGELES, CALIFORNIA 90071

## DECLARATION OF ABIRAMI GNANADESIGAN

I, Abirami Gnanadesigan, declare and state as follows:

1.    I am an attorney duly admitted to practice before this Court. I am a member at Dykema Gossett LLP, and counsel of record for Defendant JPMorgan Chase Bank, N.A. ("Defendant") in this action. I make this Declaration from my personal knowledge and, if called as a witness, I could and would competently testify hereto.

2.    A true and correct copy of Thomas Tarter's Expert Report is attached hereto as Exhibit A.

3.    A true and correct copy of the relevant portions of the transcript from the December 4, 2025 Deposition of Thomas Tarter is attached hereto as Exhibit B.

4.    A true and correct copy of the relevant portions of the transcript from the June 8, 2021 Arbitration hearing is attached hereto as Exhibit C. The recording of this hearing was transcribed by Defendant. Defendant is having the recording of this hearing transcribed by a Court Reporter.

5.    A true and correct copy of the relevant portions of the transcript from the July 15, 2021 Arbitration hearing is attached hereto as Exhibit D. The recording of this hearing was transcribed by Plaintiff. Defendant is having the recording of this hearing transcribed by a Court Reporter.

6.    A true and correct copy of the relevant portions of the transcript from the September 17, 2021 Arbitration hearing is attached hereto as Exhibit E. This hearing was transcribed by a Court Reporter.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on January 2, 2026 in Los Angeles, California.

_____
Abirami Gnanadesigan

GNANADESIGAN DECLARATION IN SUPPORT OF DEFENDANT JPMORGAN CHASE BANK, N.A.'S
MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF THOMAS TARTER

EXHIBIT A

# The Andela Consulting Group, Inc.

**18783 Tribune Street**
**Northridge, CA  91326**

**Thomas A. Tarter**                                 Phone: (818) 488-9101
**Managing Director**                               Cell: (818) 414-6685
**Expert Witness – Banking**                      Email: ttarter@earthlink.net
**Consulting – Financial and Management**

# EXPERT REPORT

## Joshua Johnson, Plaintiff

## vs.

## JPMorgan Chase, N.A., Defendant

## United States Federal Court, Central District of California
## Los Angeles Division

## Re: Credit Card Collection and Payment Disputes; Credit Reporting; Corporate Governance; and Credit Damages

### Prepared By:

### Thomas A. Tarter

*Thomas A. Tarter*

### November 29, 2023

# Expert Report of Thomas A. Tarter

## EXECUTIVE SUMMARY

- In September 2017, JPMorgan Chase's ("Chase's") failure to pay off the entire balance on Joshua Johnson's ("Mr. Johnson's") Chase Ink credit card account (sometimes the "Ink Card Account") and terminate the Ink Card Account was not consistent with banking industry standards or with Chase's Public Policy statements.

- Chase's negative trade line reporting[1] on Mr. Johnson's Ink Card Account damaged and harmed Mr. Johnson economically and non-economically.

- Banks, like Chase, in the ordinary course of business, routinely transact credit card account transactions, such as payments and account closure, electronically (online) and telephonically.

- Errors and mistakes may occur and, if they do, it is the custom, standard and practice in the banking industry to correct the error/mistake by contacting the customer telephonically and/or in writing.

- In the ordinary course of business, banks provide monthly account statements to Card Account customers[2] and retain copies of statements[3].

- Banks, like Chase, have a duty of care to provide account statements to their customers, to investigate disputes, and to promptly and timely correct errors[4].

- Chase was in a "superior position" to Mr. Johnson to detect errors, mistakes, and misunderstandings through its specialized knowledge, employee training, account data information, internal systems, and controls.  Chase failed to comply with industry standards by (1) failing to make the payment Mr. Johnson requested and (2) closing Mr. Johnson's account while not communicating with him, and then

---

[1] Each time it issued a credit report
[2] Even if there have not been any account activity and/or transactions
[3] Many banks maintain monthly customer statements online for at least five years and they are normally easily accessible through their online banking apps and sites. These statements usually come in printable formats. Summaries of transaction information are frequently available for download.
[4] For deposit, credit card and credit reporting disputes

furnishing negative trade line information to several credit reporting agencies ("CRAs")[5].

- Chase did not exercise commercially reasonable care in its Ink Credit Card relationship with Mr. Johnson by ignoring Mr. Johnson's repeated telephone calls and his credit reporting notices of dispute by not immediately conducting a thorough industry standard investigation and by continuing to report materially inaccurate[6] misleading information to CRAs.


**<u>INTRODUCTION</u>**

I have been retained on behalf of Mr. Johnson (sometimes "Plaintiff") through his counsel, David Russell, Esq. in this civil action to provide consulting and, if required, expert testimony (direct and/or rebuttal).

As part of my engagement, I have prepared this report (the "Report"). Consistent with my practice, this Report is subject to amendment, modification and supplementation based upon documents, facts, further analysis, information and/or testimony that may be provided to me in the future.

In the context and preparation of this Report, although I may use terms and terminology that may have a legal connotation, I am not discussing and/or opining from a legal perspective but rather solely from a business perspective. My use of any legal terms and/or terminology is based upon my education, training and direct experience as such terms, terminology and as such words are commonly used in the vernacular, in the ordinary course of business, by business and credit industry professionals.

---

[5] Even if Chase misunderstood Mr. Johnson's telephonic request, it could have easily searched it credit card database and discovered that the Ink Card Account delinquency was out-of-pattern and that he had a Sapphire Card Account on which he was making payments and that there may have been a communication problem.

[6] Based on my education, training and experience spanning more than 50 years and more than 150 credit reporting cases, I have learned that an item on a credit report can be inaccurate "because it is patently incorrect or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Carvalho v. Equifax Information Services, LLC*, 629 F.3d 876, 615 F.3d 1217 (9th Cir. 2010).

## ENGAGEMENT

I have been requested to review documents[7], undertake independent research, and based upon my review, education, and experience to formulate observations and opinions in a written report, deposition, and/or trial pertaining to the following:

- Discuss for the Court and Jury's consideration banking industry standards that come into play when a customer requests that a credit card account be paid off and terminated.
- Describe and discuss for the Count's and Jury's consideration credit card account reporting between banks and CRAs.
- Describe for the Court and Jury's consideration how and why inaccurate and materially misleading negative credit card account trade line reporting can affect a person, like Mr. Johnson.
- Analyze from the perspective of a banking/industry professional with more than 50 years of experience and recommend the results of my analysis to the Court and Jury on whether or not Chase's actions and conduct pertaining to Mr. Johnson's Ink Card Account were consistent with industry standards.
- Describe and discuss how Chase's actions and conduct damaged and harmed Mr. Johnson.

## QUALIFICATIONS

I am the Managing Director of The Andela Consulting Group, Inc. ("ACG"), a banking, business, management, and corporate finance consulting firm.  I have over 50 years of experience in banking, including consumer matters; credit cards; opening and closing credit card accounts; dispute investigations; dispute resolution; corporate governance; and damages.

---

[7] Please see the Documents Section of this Report.

Following the completion of my military service (1965 – 1968), which included duties as a US Army Finance and Accounting officer and as an *ex officio* member of the Fort Ord Credit Union's board of directors, I started my professional career at Lloyds Bank California, where I was a Vice President in the Corporate and California Divisions. I also have held executive level management positions at several other financial institutions, including The Sanwa Bank of California, where I was Vice President and Senior Credit Officer for Southern California; at Bank of Los Angeles, where I was one of the founding directors as well as President and Chief Executive Officer; at Center National Bank, where I was a Director, President and Chief Executive Officer; at First Los Angeles Bank, where I was an Executive Vice President and tgheWestern States Bancard Association[8], where I was a board member. I have served on the boards of non-profit corporations that have included the L.A. Free Net, Hope Foundation, and Los Angeles Bankruptcy Forum.

I have also been engaged in excess of 2,000 matters to review documents, facts and practices to provide expert services including commercial and consumer deposit and credit card accounts; corporate governance involving codes of conduct and ethics relating to bank responsibility and accountability pertaining to operational risk management; dispute resolution; bank caused damages; record retention practices and standards; and other banking and credit industry issues. In doing so, I have testified in deposition and/or trial more than 300 times and I have been qualified by arbitrators, federal, state and bankruptcy courts as an expert on commercial and consumer disputes; corporate governance; bank caused damages.

I have significant experience in business, consumer credit, consulting and corporate governance inclusive of the matters set forth in this Report. Included in my experience was my appointment to the board of directors of First Alliance Mortgage Company ("FAMCO""). I served on FAMCO's board (with Federal Court approval)

---

[8] A card association is **a group of banks or other financial institutions that licenses credit cards and processes their transactions.** Card associations are more commonly referred to as card networks. The two largest of these are Visa and Mastercard. These networks facilitate all transactions conducted with their cards.

during its bankruptcy proceedings as an independent outside director and Chair of its Audit Committee. Prior to my board appointment, FAMCO was alleged to have engaged in predatory lending schemes and unfair and deceptive loan disclosure and lending acts and practices by various state and federal authorities including the Federal Trade Commission. FAMCO filed for bankruptcy protection and subsequently entered into settlements with various parties including the Federal Trade Commission.

I have also served as the Court approved reorganization expert for the Bank of Saipan, as the common stock trustee for Marin Outdoor; and on the Boards of Directors of American Standard Development Company ("American"), Southern California Industrial Properties ("SCIP") and MFT Development Company ("MFT"). American, SCIP and MFT were real estate development companies, and I was a minority shareholder in Holiday RV, an automobile and recreational vehicle dealership.

My work with the foregoing businesses, banks and financial institutions and the FDIC, as well as with ACG, has included among other things: (i) supervising credit card account opening and closings; (ii) account investigations (iii) corporate governance and bank liability issues; (iii) developing and implementing new account opening, closing and deposit account transaction policies and procedures.

During my banking and consulting career, I served as an account officer, branch manager, regional vice president, senior executive and board member which has included bank operations (the deposit side of a bank) as well as loans.

I meet and speak with bankers, business professionals, peers, lenders and regulators concerning deposit account issues; risk management; fraudulent and unauthorized deposit account activity; and corporate governance issues. In this regard, I deal with many types of financial institutions including banks, thrifts, savings banks, commercial finance companies, credit reporting agencies. This often involves discussing with clients how banking systems and credit systems works; bank/financial institution accountability, responsibility and liability; damages, risk management; and corporate

governance practices.

As a prior financial institution officer, senior executive and board of director member, I have considerable experience in matters such as those involved in this matter. Since 1993, I have advised ACG's clients and served as a consultant (including litigation) regarding the above subject matters.

From its inception in 1995 until December 2021, I have served as a member of the panel of mediators, appointed by the United States Bankruptcy Court, Central District of California. I attended mediation bankruptcy sponsored programs at Pepperdine University, Straus Institute.

In 1965, I received a Bachelor of Science degree in business from the University of California, Los Angeles.  In 1969, I received a Master of Business Administration degree, with a specialization in finance, from the University of Santa Clara.

I served as a multi-term member on the board of directors of the Los Angeles Bankruptcy Forum and attended its educational meetings as well as attending meetings of other bankruptcy forums.

A true and correct copy of my Curriculum Vitae and an ACG Overview are attached as Exhibit A and attached as Exhibit B is a list of cases in which I have testified in deposition, arbitration and trial.

## **DOCUMENTS**

In preparing this Report, I conducted independent research and reviewed documents, publications and information (sometimes the "Documents") listed below:

- Complaint, dated September 19, 2022;
- American Arbitration Association, Award of Arbitrator, dated March 3, 2022;
- Plaintiff's Mediation Brief, dated May 30, 2023;
- Chase produced Documents;

- Mr. Johnson produced Documents;
- Deposition of Joshua Johnson ("Johnson Depo");
- Deposition of Carla Willis ("Willis Depo");
- Deposition of Barbara Burda ("Burda Depo");
- Chase's website;
- Chase's 2020 - 2022 10K Reports;
- Chase's Code of Conduct;
- Consumer Financial Protection Bureau ("CFPB") website;
- Consumer Financial Protection Bureau Supervisory Bulletin No, 12, Winter 2017;
- National Consumer Law Center website;
- Fair Debt Collection Manual, National Consumer Law Center;
- The Cost of Credit Manual, National Consumer Law Center;
- Credit Scores and Credit Reports, Evan Hendricks;
- Economic/Hedonic Damages, The Practice Book for Claimants and Defense Attorneys, Michael L, Brookshire, PhD and Stan V. Smith, PhD, 6th Printing ("Economic/Hedonic Damages");
- Consumer Banking and Payments Law Manual, Sixth Edition, National Consumer Law Center;
- DSC: Risk Management Manual of Examination Policies;
- Union Bank of California, Lender Liability Guidelines;
- 40 Years of Experience with the Fair Credit Reporting Act, An FTC Staff Report and Summary of Interpretations;
- Risk Management Association Code of Ethics; and,
- Footnote and textual references.

During my banking, business, financial institution and consulting career, in addition to what I have learned from my professional work experience, I have attended numerous seminars, conferences and courses.  I meet with business persons, executives, bankers, lenders, listen to television programs and read professional and trade publications including the American Banker, Wall Street Journal, Business Week, The Economist,

economic forecasts, Federal Reserve Bulletins and other news publications relating to business conditions, residential mortgage loan origination, loan servicing, force-placed insurance and interest rates.  The subject matters covered by these materials include: banking, lending litigation, loan servicing, residential mortgage loans, and economic forecasts. While the sources for these materials may vary, they are sponsored or published by various organizations closely associated with banking, business, commercial and consumer credit, bank operations and account transactions, economics, corporate governance and damages.

## DISCUSSION, OBSERVATIONS AND OPINIONS

In this Report, I may use terms such as accountability, actions, conduct, course of conduct, duty, fair dealing, fraud, good faith, honesty, liability, negligence, obligation, responsibility and other terms. In the context of this Report, I am not discussing, observing and/or opining from a legal perspective, but rather from a banking and business perspective regarding the use of such terms as they are commonly used in the ordinary course of business by banking, business and credit industry professionals.

The observations, opinions and conclusions expressed in this Report are based upon my knowledge, education, experience, training and independent research developed throughout my more than 50-year career in the banking, business, board, consulting and financial institutions industry, as well as information that has been produced as part of the Discovery process in this case.

## Parties Involved

**Plaintiff:** Mr. Johnson is a person and consumer who has lived in North Carolina and in California.

**Defendant:** As of August 2023, Chase was the biggest bank in America with nearly $3.3 trillion in assets. Its shareholder equity is approximately $446 billion and it has a network of over 4,700 physical branches and more than 15,000 ATMs.  According to Forbes, by

far, Chase has issued more cards than other institutions, with more than 149 million Chase credit cards in circulation.

## Case Facts and Chronology

Summarized below are certain Facts which I have chronologized to provide frames of reference for commentary, observations and opinions contained in my Report:

a. In 2008, Mr. Johnson opens his first credit card at age 18.

b. Between 2010 and 2017, Mr. Johnson opens or closes several credit card accounts with Chase, including a Chase Sapphire credit card account.

c. On January 5, 2017, Mr. Johnson opens the Chase Ink Card Account.

d. On February 17, 2017, Mr. Johnson's Ink Card Account is enrolled for online access.

e. Between February 17, 2017 and September 6, 2017, all payments for Mr. Johnson's Ink Credit Card Account are made by phone from Mr. Johnson's bank account.  Mr. Johnson was unable to use the online system to either access his Ink credit card statements and/or to make payments.

f. On September 6, 2017, Chase contacts Mr. Johnson, via a telephone call, to demand payment on his Ink Card Account.  Mr. Johnson requests that the Chase agent pay off the entire balance he owed Chase on the Ink Card Account, but the Chase agent only paid the minimum due ($111.49) leaving a $238.52 balance, which was unknown to Mr. Johnson.

g. On September 15, 2017, Mr. Johnson calls Chase requesting Chase to close his Ink Credit Account and terminate the relationship with a zero-dollar balance.  Mr. Johnson was not informed that he still owed $238.52 on the Ink Card Account.

h. Between September 15, 2017 and April 2, 2018, Chase does not make contact Mr. Johnson by phone, letter, or email to inform him that of the balance.

Mr, Johnson continues to log in and access the Chase Sapphire Account to make regular payments in full ($16,003.04).

The Ink card account balance increases to $499.53 and Chase cancels reward points worth approximately $850.

On February 15, 2018, Mr. Johnson updates his mailing address with Chase from Blount St to St Marys St.

i.  On April 2, 2018, Chase sends a letter to Mr. Johnson, which he did not receive, because it was sent to his previous Blount St mailing address.

j.  On April 30, 2018, Chase charges off Mr. Johnson's Ink Card Account.

k.  On May 21, 2018, Mr. Johnson receives a notice of adverse action from his automobile insurance company informing Mr. Johnson of a rate increase due to negative information contained in his credit report.

Mr. Johnson calls Chase and speaks with 12 different agents, to whom he explains the history of the Ink Card Account and Chase's inaccurate and materially misleading credit reporting situations but Chase refuses to change the negative CRA information it furnished.

Mr. Johnson offers to pay the entire alleged balance and not seek damages, if Chase will inform CRAs to delete; Chase refuses.

l.  In August 2020, Mr. Johnson seeks a mortgage loan, and is informed by a lender that his credit score does not qualify for a mortgage loan at the best rates to purchase a home.

m.  On August 19, 2020, Mr. Johnson files a complaint concerning the Chase Ink Account with the Consumer Financial Protection Bureau ("CFPB").

n.  On August 24, 2020, Mr. Johnson files a dispute with Equifax pertaining to the reporting of his Chase Ink Account.  Chase admitted that on or around August 24, 2020, Mr. Johnson filed a dispute with Equifax regarding his Ink Credit Card account.

o.  On August 25, 2020, Chase admitted Equifax provided notification of Mr. Johnson's dispute with Chase.

p.  On September 8, 2020, Equifax closes its investigation without correcting the inaccuracies related to Mr. Johnson's Chase Ink Card Account tradeline.

q.  On October 13, 2020, Chase's Executive Office sends a letter to Mr. Johnson responding to Mr. Johnson's complaint. The letter indicated that the updates made by Chase included "the Payment history for March 2018 to show 151-180 days late" and "The payment history for April 2018 to show 181-210 days late".

The letter also states (1) "We reviewed your account and determined it's valid. Here's what we found during our review: Payments were made using a checking in your name.  For the above reasons, the account isn't fraudulent, and you are liable for the balance.", (2) "We made 11 calls to you between September 6, 2017 and May 23, 2018, we made contact with you 3 times. Due to the time that has past we are unable to review the calls.  We sent you the enclosed letters date June 1, 2017, August 2, 2017, September 5, 2017, April 2, 2018[9] and June 6, 2018 to share with you that a payment was missed or a notification of possible change in status of the account.", (3) "Your account was enrolled to receive paperless statement on February 17, 2017, only customers can enroll their account in paperless statements.  We have confirmed that the statement notifications were successful to your email and were not returned as being undeliverable.  We have enclosed your 2017 and 2018 billing statements for review.", and (4) "We apologized for any confusion or frustration you experienced trying to resolve your concern.  We were unable to locate any recent calls about your account and the calls we found noted to your account we are unable to review due to the length of time that has passed."

r. On March 17, 2021, Chase submits an Automated Universal Dataform ("AUD") stating the "Account Status" is "97 – Unpaid balance reported as a loss (charge-off)", the "Compliance Condition" is "XA-Account closed at consumer's request", and the "Account History" is "past due November 2017-July 2020".

s. On March 17, 2021, Chase submits an Automated Credit Dispute Verification ("ACDV") with a "Response Code" of "23-Disputed information", and an "Account Status" of "97-Unpaid balance reported as a loss (charge-off) changed to 64-Account paid in full, was a charge-off".

t. On March 2022, after the arbitration award was issued, Chase removed all adverse credit references pertaining to Mr. Johnson's Ink Card Account.

## Case Overview

Here, we have the largest bank in America both in asset size and the number of credit card issued.

---

[9] There is an unexplained seven month gap between September 2017 and April 2018 where there are no Chase letters and then another two month gap between April and June.

Chase has many types of credit cards and services it advertises and solicits to attract customers.  It provides services and promises its customers to operate in a "safe and sound" manner accomplished through having multiple layers of support staff, internal operating systems, software and hardware to transact business.

Chase actively solicits credit card accounts by offering financial products (commercial and personal) that are typically accessed on-line or telephonically.  Access to and information concerning credit card accounts is restricted and highly confidential. Consequently, it is my opinion that a financial institution has a duty and is expected to use reasonable care to promptly and timely correct errors, mistakes and misunderstandings in account activity including but not just limited to credit reporting and the investigation/reinvestigation of payment disputes.

The industry standard is that the care to be provided is that care which a reasonably prudent financial institution would provide under like circumstances. Among the circumstances to be considered are the practical feasibility and cost of various operational measures including employee training, call centers, credit dispute investigations, quality control, records retention, software and technological systems (such as for payments, phone logs and recorded telephone calls) and the risk of harm to its customer which the financial institution knows, or in the exercise of due care should know, presents a reasonable likelihood of happening. In this connection, while the financial institution is not an insurer or guarantor of the safety of its premises and cannot be expected to prevent all credit card transaction activity, the fact that a payment error occurred, without Chase taking commercially reasonable steps to correct the error, to respond to Mr. Johnson's communications, to investigate his Ink Card Account CRA dispute, is evidence that its ability to provide industry standard customer service and compliance with the Fair Credit Reporting Act ("FCRA") was compromised.

Likewise, punishing the credit card accountholder by not promptly and timely correcting its materially inaccurate and misleading negative trade line reporting is a clear example of "bad faith", as well as being downright punitive, because Mr. Johnson has been damaged economically and non-economically.  It has been my experience that when

13

a customer disputes a credit card payment transaction, the card issuer responds (virtually immediately) to telephone calls and there is a thorough investigation.

## Banking Industry Standards and Practices

All banks in the United States, national and state, are insured by the Federal Deposit Insurance Corporation (the "FDIC").  Banks are regularly examined by regulatory agencies in order to determine conformity to banking industry customs, standards and practices as well as to maintain the public's confidence in the banking system and in individual banks.  The basic guidelines for bank examinations are contained in the Federal Deposit Insurance Corporation, DOS Manual of Examination Policies (the "FDIC Exam Manual").  There is nothing mysterious or secret regarding that manual.  It can be Internet accessed from the FDIC's web site at https://www.fdic.gov/resources/supervision-and-examinations/examination-policies-manual/.

## Credit Card Accounts are One of Chase's Most Important Products

Along with checking accounts, credit card cards are one of the key service products that Chase provides as well as being a significant method it uses to invest and to generate income.

Credit card accounts are an integral part of Chase's banking and corporate business system.  They are used routinely, on virtually a daily basis, in the normal every day course of business and are a commonly used mechanism for payments and receipts that can be easily accessed, preserved and provide written evidence of transactions through a traceable paper trail.    It has been my direct personal and professional experience that Chase maintains detailed documentation and transaction records because one of its job to monitor accounts for potential illegal and unauthorized activity as well as to support their customers (card holders and the businesses that accept credit cards as a method of payment for goods and services).

Banks, like Chase, are well aware of the risks associated with checking accounts including the need for proper documentation and to be extremely careful in credit card

14

payment programs which are often linked to deposit accounts to provide a direct, traceable, link to track payments as well as to facilitate card payment collection filter mechanisms and systems involving business and consumer credit card and deposit accounts, telephonic and personal verification, Know Your Customer ("KYC") protocols, and common sense.

## Know Your Customer ("KYC")

KYC is a banking industry term used to refer to the importance of a bank knowing about its customers business, deposit history, credit history to monitor risk and in anti-money laundering risks. The objective of KYC guidelines in banks is to prevent the bank from being used, intentionally or unintentionally, by criminal elements for money laundering, illegal and/or unauthorized activities such as ID Theft and deposit account take overs. Related procedures also enable banks to better understand their customers and their financial dealings. This helps them manage their risks prudently.

## The CRA Credit Review Process

Upon receipt of a consumer's credit dispute, CRAs fill out templated-based summaries of the consumer's disputes called Automated Credit Dispute Verifications ("ACDVs") and send them to the credit furnisher. The credit furnisher then has 30 days to investigate the consumer's dispute, determine if it was valid, and fill out the response section of the ACDV with directions to the CRA to either modify the disputed item, delete it, or leave the item unchanged.   The credit furnisher reviews the CRA furnished information and fills out ACDVs according to the Consumer Data Industry Association's ("CDIA") Credit Reporting Resource Guide, which is often referred to by the shorthand "Metro 2."[10]. In the ordinary course of business, furnishers are expected to utilize all

---

[10] Metro 2 is a standardized reporting format published by the CDIA.

reasonable available resources[11] to complete research and an investigation to make a final credit reporting decision.

e-OSCAR is the "Online Solution for Complete and Accurate Reporting" system through which the consumer reporting industry (consumer reporting agencies and data furnishers) resolve disputes brought by consumers concerning the accuracy of information maintained in their credit files.

When a consumer contacts a consumer reporting agency with a dispute, the agency transmits an electronic form called an ACDV through e-OSCAR to the data furnisher. The data furnisher responds to the consumer's dispute by returning the ACDV through e-OSCAR. For example, if a consumer disputes the accuracy of the payment history on their Chase credit card to Trans Union, Trans Union will send an ACDV to Chase informing Citibank of the consumer's dispute and Citibank will respond to that dispute by returning the ACDV to Trans Union.

e-OSCAR allows data furnishers to correct or delete a consumer's account by sending an electronic form called an AUD. When a consumer contacts a data furnisher and requests a change of information that has been previously reported, the data furnisher researches the account. If the data furnisher verifies that the account information in question needs to be modified, the company will use the e-OSCAR system to complete an AUD.

However, while not a legal opinion, I am aware that the FCRA, specifically 15 U.S.C. § 1681s-2(b)(1), provides guidance that, after receiving a notice of dispute, the furnisher shall:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the [CRA]. . .;

(C) report the results of the investigation to the [CRA];

---

[11] For example: all of the disputing consumer's existing credit and deposit accounts with the furnisher, collection notes and information required to be contained in the furnisher's central information system.

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . .; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1) ... (i) modify ... (ii) delete ... or (iii) permanently block the reporting of that item of information [to the CRAs].

### Chase's Credit Card Payment and Credit Reporting Dispute Investigations Were Not Consistent With Credit Reporting Industry Standards

Chase has denied that:

- it failed to conduct a reasonable investigation or review of all relevant information including Mr. Johnson's CFPB complaint,

- it did not furnish information regarding Mr. Johnson's Ink Card account which it knew or should have known was inaccurate and incomplete; and

- its conduct did not damage Mr. Johnson.

`   Respectfully, I disagree.

Specifically, I note that Chase's investigation of the FCRA complaint was deficient in at least the following ways:

- Chase's investigation likely took only a few days.  (Burda Dep. 49)

- Chase failed to investigate or validate where the $499 balance came from. (Burda Dep. 77)

- Chase failed to recover purged comments in its system of record relevant to Mr. Johnson's complaint.  (Burda Dep. 95).

- Chase failed to review Mr. Johnson's CFPB complaint.  (Burda Dep. 101-103).

- Chase failed to consider whether the information reported regarindg Mr. Johnson's account was misleading.  (Burda Dep. 104).

## <u>Corporate Governance</u>

It has been my direct experience that financial institutions typically develop appropriate policies and procedures to address fraudulent activity because violations may result in economic losses, litigation expenses, regulatory sanctions and damages to the financial institution, its owners and its customer.  Disputes may occur in unauthorized deposit account transactional activity.  **I have found that while financial institutions may have extensive written policies and procedures that they are not always followed and/or enforced. Simply put, errors and mistakes and misunderstandings may occur in the ordinary course of business and are major risks that financial institutions recognize.**

## <u>Chase's Public Policy Statements and its Code of Conduct</u>

My review of Chase's Code of Conduct was that it is similar to many other financial institutions[12].  On its website[13], Chase says that "In a fast-moving and increasingly complex global economy, our success depends on how faithfully we adhere to our core principles: delivering exceptional client service, acting with integrity and responsibility and supporting the growth of our employees."

In my opinion, Chase's actions and conduct with respect to Mr. Johnson were not consistent with its core principles or with industry standards because it made public policy statements upon which Mr. Johnson reasonably relied; but Chase's actions and conduct with Mr. Johnson were contrary to its public policy statement and represented, in this case, a Jekyll and Hyde personality of saying one thing publically and then acting differently with its customers.

Additionally, it has been my direct experience that financial institutions are well aware of their liability as well as their accountability and responsibility for correcting credit card payment errors and mistakes as well as promptly and timely correcting trade line credit reporting. in credit card account relationships.

---

[12] I have reviewed more than 50 Codes of Conduct and Ethics including: Bank America; Citibank; JPMorgan Chase; US Bank, Union Bank of California; Chase; Wells Fargo Bank.
[13] https://www.jpmorgan.com/about-us

## Herculean Efforts Should Not Be Required by Consumers

It has been my direct experience that bank customers should not be expected (forced) to have to undertake Herculean efforts after informing their financial institution of payment errors and inaccurate credit reporting, such as having to hire an attorney. Here, Chase, based on the chronology and facts set forth above, clearly did not act consistent with the industry standards.   Chase's acts of failing to acknowledge that its reporting of Mr. Johnson's account was inaccurate are inexcusable and punitive. Consequently, Chase should be held accountable and responsible for its actions and conduct.

## Operations and Business Risk

Banks, and financial institutions are well aware that their actions and conduct  can have a profound impact on their customers because errors and/or mistakes could disrupt their businesses, result in unauthorized credit card and deposit account activity, damage customers, damage their reputation, and create significant financial and legal exposure. In the ordinary course of business, they experience numerous instances of personnel caused mistakes, computer systems, software, networks and other technology assets problems on a daily basis.  Although they may devote significant resources to train personnel, to maintain and regularly upgrade their systems and processes which are designed to protect their computer systems, software, networks and other technology assets, as well as their intellectual property, their efforts and measures may not always be effective. Errors and mistakes routinely occur in transaction processing, failure to understand communications and verbal instructions and breaches of their internal control system and compliance requirements.

The risk of loss also includes potential legal actions, fines or civil money penalties that could arise as a result of an operational deficiency or as a result of noncompliance with applicable regulatory standards, adverse business decisions or their implementation, and customer attrition due to potential negative publicity.

Public interest is relevant because errors and mistakes are harmful to depository institutions, their customers and their insurers including the FDIC and NCUA [TODO: this is irrelevant because the case involves a credit account, not a deposit account].  It is

the financial institution industry standard for them to provide internal systems and controls for protection and the prompt correction of errors and mistakes in order to protect against operational risk, from inaccurate or misleading credit reporting and the balances due to them or what are due to customers.

Regular and ongoing training should be in place at all financial to thoroughly train their entire staff.  They fall below industry standards if they do not have the proper training for credit card dispute investigation and the proper and necessary knowledge of the proper steps to resolve disputed events and transactions for all types of accounts including but not limited to conducting thorough investigations and to correct any errors and mistakes.  Employees are the front-line to assist customers to thorough investigate errors and mistakes and to take appropriate corrective action.   Failure to have: the proper training and knowledge, undertake a thorough investigation, ignoring "red flag" warnings, response delays and failure to correct errors, mistakes and misunderstandings may result in losses to them and to their customers.  This has given me the impression that the Chase personnel involved did not have:

- a clear delineation of their roles and responsibilities, to thoroughly investigate Mr. Johnson's payment and credit disputes;
- effective issues management processes to escalate Mr. Johnson's disputes to senior management; and
- effective operational control management to address collection, payment and credit reporting disputes.

Guidelines for establishing standards include the utilization internal lines of defense as well as another external standard include:

- First Line of Defense – Management.
- Second Line of Defense – Risk Management and Compliance.
- Third Line of Defense – Internal Audit.
- Fourth Line of Defense – External Auditors.

At this junction, it appears to me, with respect to Mr. Johnson, Chase did not comply with the aforementioned Guidelines because of its failure to take prompt corrective action which was:

- prior to September 2017, by not recognizing there were significant problems with Mr. Johnson's Ink Card Account, after being informed he was not receiving billing statements;

- from an operational perspective, by not paying off the entire balance on his Ink Card Account, and by not closing his account with a $0 balance in September 2017;

- by not acknowledging that it was plausible that there may have been a telephone communication error, mistake, and/or misunderstanding in September 2017[14];

- in a letter from Chase's Executive Office, dated October 14, 2020, Chase informed Mr. Johnson that "We apologize for any confusion or frustration you experienced trying to resolve your concern.  We were unable to locate any recent calls about your account and the calls we found noted to your account we are unable to review due to the length of time that has passed."[15];

-  followed by Chase reporting to CRAs Mr. Johnson's Ink Card Account as delinquent and a charge-off, which adversely impacted his credit score and credit rating;

- from a FCRA/CCRA perspective, when Chase did not correct the materially misleading information it provided to the CRAs and failed to conduct a commercially reasonable investigation.

Presently, I do not have sufficient information to formulate opinions at the third or fourth lines of defense.

Previously in this Report, I referenced the DSC (multi-agency, including the FDIC and OCC) Risk Management Manual of Examination Policies and Procedures to further illustrate the importance of controlling risks related to bank operations and credit card accounts.

---

[14] It has been my direct experience that card issuers, like Chase, in the ordinary course of business inform customers that calls "may be recorded for quality control purposes", however Chase has not produced any telephone recordings from 2017 or 2018.
[15] *Id.*

It has been my experience, that guidelines and rules are created because financial institutions realize that their employees are in a unique position to potentially create, prevent, detect and/or amicably resolve disputed credit card transactional activity as well as to implement preventative measures.

Risk comes in many different forms such as the following seven major risk types: liquidity risk, credit risk, market risk, interest rate risk, operational risk, legal and fiduciary risk, and reputation risk.

Operational risk is inherent in the daily activities of a financial institution. Operational risk can manifest itself in various ways, including errors, fraudulent acts, business interruptions, inappropriate behavior of employees that do not perform in accordance with their scope of employment. These events could result in financial losses and other damage to the financial institution, including reputational harm as well as damage to their customers like Mr. Johnson.

### A Financial Institution  Can Exercise Control and Influence its Customers

It has been my direct experience that a bank (like Chase) can exercise control and influence over a customer in many different ways including financial, verbal and written communication and direction, opening and closing credit card and deposit accounts, credit card and deposit account transaction investigation and research, employee/customer interviews, examination of internal records.   In order to avoid the pitfalls of liability, it is the custom, standard and practice in the financial institution industry for personnel involved in investigating allegations of failure to make payments, to close an account and credit reporting dispute resolution to be careful of their communication practices with customers, their course of conduct; the influence that they may have on a customer's quality of life and the customer's relationship with the financial institution; oral statements, and lender liability issues[16].

In this case, it is my opinion that Chase was responsible for and should be held accountable because of their course of conduct with Mr. Johnson.  For example: after being notified in April 2018 and then again in May 2018 of a recurrent credit card

---

[16] Numerous texts and training manuals exist, including the Bankers Compliance Group, Standard Practice Manuals.

payment and credit reporting dispute problem, I have not seen evidence that Chase conducted a thorough investigation as to the plausibility that it was Chase that made an error and/or mistakenly did not hear Mr. Johnson's request to pay off the entire balance due and to close the Ink Card Account. To the contrary, Chase continued its negative Ink Card Account trade line reporting.

Consequently, it is my opinion that Chase was responsible for and should be held accountable for the damages and harm that resulted from its actions and conduct.

### **Trust is Cornerstone of  Credit Card and Deposit Account Relationships**

Based on my more than 50 years of experience, the fundamental fiber of any bank relationship is mutual trust.  This involves honesty and fair dealing on the part of both parties. My review of facts and chronology of events informed me that Mr. Johnson was a very hands-on and proactive in monitoring his Ink Card Account relationship with Chase.  Here, it appears to me that Chase dropped the ball, did not do its part, and broke Mr. Johnson's commercially reasonable expectation that Chase was going to do the right thing.

### **Good Faith and Fair Dealing**

It has been my direct experience that financial institution personnel (at all levels) are generally trained to recognize the fundamental concept of good faith and fair dealing and that they have an obligation of good faith in their job performance and how they act in the ordinary course of business with bank customers.  That did not occur with Mr. Johnson.  Chase never acknowledged that an error, mistake and/or misunderstanding may have happened.

During my career I have observed that a financial institution credit card customer can be significantly impacted through a  course of conduct involving employee errors, mistakes, misunderstandings; poorly trained or rogue[17] employees, where an employee has acted in direct violation of the financial institution's code of conduct and ethics as well as in violation of state and federal FCRA laws and regulations and CFPB guidelines;

---

[17] An employee with a bad attitude or who does not care.

but nevertheless, the financial institution had to stand up, acknowledge the action, conduct and the consequences by accepting accountability and responsibility. Accountability and responsibility are inherent risks that represent the cost of doing business.

**It has been my direct experience, that a financial institution may breach its operational and credit reporting obligations by a course of conduct which may, unbeknownst to the consumer, may be contrary to the financial institution's policies, industry standards, laws and regulations[18].**

Further, it has been my direct experience that, in the ordinary course of business, banks are acutely aware that:

- credit card account relationships become the basis and mechanisms upon which consumers and businesses transact business;

- verbal (telephone)communication errors, mistakes and misunderstanding may occur;

- in the event a customer (like Mr. Johnson) does not make scheduled payments written for 60 days, U.S. Post Office stamped and mailed collection notices are important commercially reasonable collection mechanisms;

- trade line reporting is impacted by the conduct and actions of bank employees;

- communication (verbal and/or written) between financial institution employees and a customer can help prevent credit card payment disputes and adverse trade line reporting.

It has been my direct experience that financial institution industry professionals, directors, senior management, officers and employees are well aware that customers may sue if their actions and course of conduct may have damaged and/or harmed them. **In fact, in the DSC: Risk Management Manual of Examination Polices, Fidelity and Other Indemnity Protection, Section 4.4 p. 1, it states that:**

> **"Risk management is intended to minimize the cost associated with certain types of risk and provide prudent protection. The maintenance of appropriate levels of necessary insurance coverage is a key aspect in the risk management process. It deals with pure risks that are characterized by chance occurrence and may only result in a financial loss, as opposed to a**

---

[18] The financial industry standard is to comply with laws and regulations.

**speculative risk which affords the opportunity for financial gain or loss. Such pure risks are separated into three major exposure categories: liability, property, and personnel."**

Consequently, financial institutions (like Chase) are well aware that they may incur liability due to the actions of an employee who breaches its policies, procedures, codes of conduct and ethics.

### General Overview on Damages

1. Based on my experience and training, in this Report, I have focused on two primary types of damage: Economic and Noneconomic, that directly impacted Mr. Johnson.

2. **N**ot every element of a bank customer's damages can have a "price tag" placed on them, especially with respect to the impact of emotional issues on customers.   **I am mindful that with respect to emotional damages, Justice Scalia commented "that doesn't mean it's not actual. It just means that it's hard to quantify, but you've had the emotional harm.  Why isn't that an … actual harm."[19]**

3. Outlined below are some categories of damage.

   "Some Categories of Typical Damages/Costs:
   (1)   Expended time and energy to correct errors not of one's making;
   (2)   Sleeplessness, physical symptoms;
   (3)   Sense of helplessness, loss of control over personal data theft;
   (4)   The emotional distress stemming from, and associated, with all of the above.

   **Additional FACTORS include:**
   (1)   The nature and substance of the category of damage
   (2)   Time & energy to solve the immediate problem
   (3)   The expectation that the problem was solved
   (4)   The number of recurrences
   (5)   The period of time over which the problem persists"
   In essence, a damage formula, like a credit scoring model, would need to 'assign weights or points' to each factor and then multiply Factor (1) by Factor (2); then that result would be multiplied by Factor (3), and then by

---

[19] Justice Antonin Scalia, Oral Argument, Doe v. Chao, (Dec 2003),

Factor (4). Etc.  The purpose is to measure the compounding nature of the damage."[20]

4. It is my opinion that Mr. Johnson has been damaged in multiple economic and noneconomic ways including but not just limited to the following categories:

    Increased Cost of Credit;
    Lost Opportunity to purchase a home;
    Lower Credit Score;
    Loss of Credit Availability;
    Chilling;
    Loss of Quality of Life;
    Time and Energy expended seeking resolution:
    Sleeplessness and Stress;
    Mental anguish, frustration and upset;
    Sense of helplessness, loss of control;
    Out-of-pocket expenses for postage, gas for driving to and meeting with counsel;
    Legal Expenses.

5. It has been my direct experience that the existence and consequences of materially inaccurate and materially misleading credit reporting could be compared to a variety of difficult situations.  They are stressful, frustrating and time consuming.  Further, once the materially misleading and materially inaccurate delinquent payment and charge-off credit reporting information activity happens people are often not ever able to get back to 100%.  The quality-of-life enjoyment is diminished by having to spend time attempting to rectify a negative situation during the period of the events as well as residual future effect.  In this case, I am shocked that Chase did not acknowledge that there may have been an inadvertent misunderstanding[21].

6. During my banking, business and consulting career, I have met with hundreds of consumers. It has been my direct experience that consumers, like Mr. Johnson, are often damaged by the anxiety, frustration, sense of helplessness, loss of sleep, stress, time spent in attempting to get a materially inaccurate and misleading credit reporting corrected. Based on my experience (not an opinion, since I am not

---

[20]   Credit Scores and Credit Reports, How the System Really Works, What You Can Do, Evan Hendricks, pg. 311, Chapter 20, Damage and Damages.

[21] TODO

a psychologist), Mr. Johnson was damaged and injured by Chase and that quantification of those damages should be determined by the Court and Jury.

7. **Chilling** is a term used in the credit industry that pertains to individuals who are afraid of applying for credit because they are afraid that they will be embarrassed by being turned down and/or because they believe they will be turned down, therefore, they just do not apply. Simply put, they will be frozen out of credit markets and their perception of rejection becomes a reality because they stop applying for credit.

Those same credit damaged individuals may also be "forced" to pay cash for most purchases and lose the convenience of being able to purchase things including online purchases that require the use of a credit card.

Consequently, it is my opinion that: (i) "Chilling" affects consumers (like Mr. Johnson) who may have stopped applying for credit (even to take advantage of promotional offers at places, like Best Buy, Home Depot, Kohls, Lowes Home Depo and Target); but also merchants who may lose sales opportunities because consumers did not purchase goods from them; and, (ii) consumers (like Mr. Johnson) who fear the stigma of rejection and embarrassment caused by inaccurate negative trade line reporting..

8. **Credit Scoring:** The information included in a consumer credit report contributes to a risk assessment of a consumer's overall creditworthiness and determines their FICO Scores. FICO Scores are calculated using information contained in CRA-generated consumer reports (like those issued by Experian). FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of their risk of default and creditworthiness.

FICO Scores factor in the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

Credit score computations are heavily weighted to take into account payment histories and delinquent account information furnished to them, and data contained in public records, as illustrated below:

**Factor 1: Payment History (35%)**
- Track record with various lenders
- Length of Positive Credit History
- Length of Time that has Passed Since the Most Recent Negative Item
- Severe Unpaid Debts – Public Records
- Severity & Quantity of Delinquencies

**Factor 2: Amount Owed – Extent of Indebtedness (30%)**
- Quantity of Credit Accounts
- Ratio of Credit Balance to Credit Limit
- The amount owed on all accounts
- How Much is Owed On Each Type of Account?
- How Much of Mortgage or Other Installment Loans Are Paid Off?

**Factor 3: Length of Credit History (15%)**
- Overall Length of Credit History (In General)
- How long have specific credit accounts been established?
- How long has it been since you used certain accounts?

**Factor 4: How Much New Credit Are You Assuming? (10%)**
- How many new accounts, particularly credit card accounts?
- How long has it been since you opened a new account?
- How many recent requests for credit have you made, as indicated by inquiries to the credit bureaus?
- Length of time since credit report inquiries were made by lenders
- Whether you have a good recent credit history, following past payment problems

**Factor 5: Inquiries (10%)**

As a consumer's credit profile gets stronger over time with no negative information, consumers become a better credit risk candidate for credit providers. Therefore, the credit grantor asks for less interest or down payment as compensation for letting the consumer use credit to pay for services and/or to use its money to extend loans for credit cards, cars, and mortgages.

Here, Mr. Johnson's ability to obtain credit was adversely impacted by the materially inaccurate and misleading Chase Ink Credit Card trade line reporting. While I cannot say that Chase's Ink Credit Card trade line reporting was the only reason why Mr. Johnson was informed that he was not qualified for a mortgage

secured loan to purchase a home, I can say, with a high degree of commercial certainty, is that it was a significant factor that was considered by lenders.

9. **Time, Energy And Money Have Been Needed To Remedy Chase's Refusal To Request Cras To Delete And Suppress Mr. Johnson's Ink Credit Card Adverse Reporting**

Credit and financial issues often require a considerable expenditure of time, energy and money to attempt to remedy deposit account errors and misconduct. The damage remedy process, also takes a toll on the victims (like Mr. Johnson) because of the impact that it has on the quality of their lives; and instead, they are forced to spend time and money (such as retaining counsel) to get their money back. as well as their emotional ability to recover from an event that may have been caused by an error, mistake and/or a misunderstanding. This happened to Mr. Johnson because of Chase's callous, careless, willful and reckless disregard for him. Mr. Johnson has also incurred significant expenditures relating to retaining counsel, a banking industry expert and out-of-pocket costs in order to help resolve this matter and obtain restitution.

10. **Time is a valuable commodity[22].** Professionals place value on the time they spend on behalf of a client by charging clients for their time. There is a finite amount of time in each day and in each person's life. Time cannot be replaced. The past can only be re-visited through memories (which in this case are unpleasant), it cannot be undone. Further, it has been my experience that the time spent attempting to get reimbursed is often akin to a second job.

A formula that I have used to compute the "Value of Time" for issues such as trying to resolve this matter, research and time spent speaking with counsel is as follows:

**Hours spent x Hourly Compensation Rate = $ Value**

A similar formula can be used for loss of sleep.

---

[22] I am mindful of an article in the Wall Street Journal focused on the value of time and cost of time benefits and trade-offs. "Put a Dollar Value on Your Time, With Help from New Tools", by Sue Snellenbarger, Wall Street Journal, Personal Journal Section, July 22, 2015, p. D 1.

## **CONCLUSIONS**

(1) Chase's investigation of Mr. Johnson's FCRA complaint was not reasonable.

(2) Chase's credit bureau reporting, which failed to acknowledged that it was possible that it made an error, mistake or a misunderstanding occurred, was not industry standard.

(3) Mr. Johnson suffered damages, as described above, in an amount that should be quantified by the jury. .

**Supplemental Information**

Pursuant to Federal Rule of Civil Procedure 26: Disclosure of expert testimony, the following is submitted:

1. Expert Witness:
   Thomas A. Tarter
   Managing Director
   The Andela Consulting Group, Inc.
   18783 Tribune Street
   Northridge, CA 91326
   818 -488-9191

   Please refer to Exhibit A for my CV and an Andela Overview.

2. Data and information considered by the expert witness in formulating his opinions:
   Please refer to the Qualifications, Documents Reviewed and Footnotes contained in this Report.

3. Statement of all opinions to be expressed and the basis and reasons therefore:
   Please refer to this Report.

4. Publications – I have none in the past 10 years.

5. Compensation:
   $295.00 per hour for litigation consulting, report preparation and travel time.
   $495.00 per hour for testimony at deposition or Arbitration.
   No minimums.
   No contingencies.

6. List of cases in which I testified at trial, deposition, mediation or arbitration:
   Please refer to Exhibit B.

**Attached documents include:**

**Exhibit A - CV and Andela Overview;**
**Exhibit B - Case Log – arbitration, depo, mediation and trial**

# EXHIBIT A

**Andela and Tarter Background Information:**

**See Attached:**
**Andela Overview**
**Thomas Tarter's Resume**
**Addendum to Thomas Tarter's Resume**

# The Andela Consulting Group, Inc.
### 18783 Tribune Street
### Northridge, CA 91326

**Thomas A. Tarter, Managing Director**                     Telephone:(818) 414-6685
**Expert Witness - Banking**
**Consulting - Financial and Management**            E-Mail: **ttarter@earthlink.net**
                                                     Website:andelaconsulting.com

The Andela Consulting Group, Inc. ("Andela Consulting"), managed by Thomas A. Tarter, engages in banking, credit (commercial and consumer) and credit damage Expert Witness/Litigation Support.    Andela Consulting has provided business reorganization, management and financial advice to financial institutions and businesses.  With more than 50-years of experience as a banker, business owner, a consultant and financial advisor, Mr. Tarter brings to Andela Consulting's clients extensive knowledge on how businesses, banks, creditors and financial service companies operate.

Andela Consulting has been involved in many matters which include: retention by regulatory agencies, financial institution reorganization, banking, class actions, court approved independent directorships, financial advisor, cash controls and management, checking accounts, electronic funds transfer, consumer credit, credit cards, car financing, debt collection, embezzlements, FCRA, FDCPA, TILA, RESPA, loan origination, loan mods, foreclosures and repos, credit damages, Ponzi schemes, consumer and commercial real estate lending, including land acquisition and development, bankruptcy plan interest rate and plan feasibility analysis, development and construction loans, corporate lending, corporate governance, loan servicing, lender liability, letters of credit, loan commitments, bank and guaranty demands, loan transactions, shareholder and insider matters, internal audit, banking Regulations and compliance matters.

Andela Consulting was formed in 1993 and since that time it has worked with many types of clients in a variety of areas.  These include: (i) Sunshine Makers, Inc. d/b/a Simple Green to serve as an independent director; (ii) Marin Outdoor, appointed as a director in connection with its financial restructuring and Chapter 11 proceedings;  (iii) Numerous class action case fairness opinions pertaining to class member Settlement Agreement benefits (monetary and non-monetary) for borrowers; (iv) A California Bank to provide litigation consultation regarding lending industry customs, standards and practices involving loan commitments; (v) Retained by the FDIC as receiver in multiple cases involving appraisal, construction lending, guaranty, loan origination and underwriting issues; (vi) Numerous cases involving mortgage loan servicing; (vii) Consumer credit - TILA, loan and lease transactions, credit damages; (viii) Fifth Third Bank Overdraft "high to low sorting" litigation; (ix) Numerous Loan Modification cases; (x) Numerous Class Action cases involving Loan Servicing issues; (xi) Auto financing and leasing; (xii) A Viatical Service Company to provide expert testimony and litigation consultation regarding asset-based lending industry customs, standards and practices and lender liability issues; (xiii) A Financial Institution to provide expert testimony and litigation consultation regarding real estate loan restructuring, construction and permanent lending; (xiv) Credit damage analyses – consumer credit arising from debt collection, loan servicing, credit reporting errors; (xv) Developed a cash management and control system for multiple inter-related Chapter 11 debtors operating in several states including Hawaii; (xvi) Developed court approved business rehabilitation and marketing plans for a troubled bank; (xvii) Appointed to the board of directors

of First Alliance Mortgage Company, as an independent, outside director, after the company filed for bankruptcy protection; (xvii) Numerous bankruptcy plan related interest rate computations and plan feasibility analyses; (xviii)) Numerous cases involving embezzlement, forgery and endorsement issues; and (xx) Oswell Self Storage to provide turnaround management and advisory services to a Chapter 11 debtor.

# THOMAS A. TARTER
## CURRICULUM VITAE
**The Andela Consulting Group, Inc.**
**18783 Tribune Street**
**Northridge, CA 91326**
Telephone: (818) 414-6685
E-Mail: **ttarter@earthlink.net**

## EDUCATION:

University of California at Los Angeles, Bachelor of Science degree in Business, 1965.

University of Santa Clara, Master of Business Administration degree with a specialization in Finance, 1969.

## LECTURER:

Mr. Tarter has been an expert, instructor, panelist and/or guest lecturer for several professional organizations and institutions of higher education, including the following:

> American Institute of Banking
> American Management Association
> Los Angeles City College
> United States Small Business Administration
> Gonzaga University School of Law
> University of San Diego School of Law
> Practicing Law Institute
> National Association of Consumer Advocates
> International Institute of Business and Banking
> Orange County Bankruptcy Forum
> Los Angeles Chapter of the American Society of Appraisers
> Southern California Chapter of the Appraisal Institute

## PROFESSIONAL EXPERIENCE:

September 1993 – Present
**The Andela Consulting Group, Inc.**, Managing Director
Provides expert witness, management, financial, and advisory services involving corporate governance, commercial and consumer credit, credit damages, credit cards, deposit accounts, management, court approved directorships, court approved financial advisor and financial institution matters.

Mr. Tarter has served on boards, assisted in corporate restructures, and has provided advisory services to a diverse group of clients including consumers, corporations, law firms, banks, financial institutions and governmental agencies, including the FDIC, as Receiver.

Thomas A. Tarter CV

Page 2

October 1985 – August 1993

**First Los Angeles Bank,** Executive Vice President, Member of Officers Loan Committee

During his association with First Los Angeles Bank, Mr. Tarter was responsible for supervising the bank's largest banking region and was involved in developing compensation and incentive programs, asset/liability management, development of policies and procedures (deposit, operations and credit) and strategic planning. Additional responsibilities included marketing, public relations, mergers, acquisitions, the development of non-traditional banking businesses, such as a mortgage banking division and an SBA loan department.

November 1984 – September 1985

**Center National Bank**, Director, President and Chief Executive Officer

Recruited to administer a troubled financial institution. Developed programs to implement regulatory requirements and to constrict the bank's assets to adhere to capital constraints. Developed and implemented policies and procedures involving credit administration, operations, risk management and personnel including compensation, termination, staff curtailment and recruitment.

January 1980 – October 1984

**Bank of Los Angeles**, Organizer, Founding Director, President and Chief Executive Officer

Responsible for organization and completion of two stock offerings, initial (1982) and secondary (1984), both of which were over-subscribed. Responsible for the initial and ongoing organization of the bank, as well as supervising its operations and growth. Negotiated the acquisition of the American City Bank - Beverly Hills from the Federal Deposit Insurance Corporation. Developed and implemented policies and procedures including compensation, personnel, credit and audit.

1977 – 1980

**First Los Angeles Bank**, Regional Vice President and member of the bank's Officers Loan Committee

1976 – 1977

**Sanwa Bank of California**, Vice President and Senior Credit Officer for Southern California and Member of Loan Committee.

Responsible for administering the bank's loan portfolio in Southern California, including the implementation of policies, procedures and controls to monitor the bank's corporate, real estate, consumer loan activities and its operations risk management systems.

Thomas A. Tarter CV

Page 3

1969 – 1975

**Lloyds Bank California**, Vice President, Corporate and California Divisions

Responsible for the administration and development of major corporate relationships. Developed new lending programs including acceptance and SBA financing.

Additionally, Mr. Tarter was a founding organizer of Hancock Savings Bank. He shared responsibility for its formation, organization and co-organized its initial stock offering.

**TESTIMONY**:

Mr. Tarter has provided expert testimony at deposition and trial in municipal, state and federal courts as well as at arbitration.

Litigation and consultation clients included: Bank of the West, Mobil Oil Corporation, Ford Motor Credit Corporation, CNA, Credit First Bank, Republic Bank, Sanwa Bank, Citicorp, Deutsche Bank, CUMIS, GEICO, State Farm, FDIC as Receiver, Harvard University, JPMorgan Chase, Gonzaga University, University of California at Irvine, Wells Fargo Bank, Union Bank of California, Washington Mutual, Bank of Saipan, United Mortgage, Small Business Administration, as well as individuals, municipalities, partnerships and businesses.

**BOARD MEMBERSHIPS AND BUSINESS AFFILIATIONS INCLUDED**:

Western States Bankcard Association
Sunshine Makers, Inc. d/b/a Simple Green
Fort Ord Credit Union
Holiday World RV
Marin Outdoor (Bankruptcy related directorship)
First Alliance Mortgage Company (Appointed director during bankruptcy proceedings)
American Standard Development Company, Inc.
BKLA Bancorp
Center Financial
Los Angeles Bankruptcy Forum (multi term)
Los Angeles Business Council, member of Executive Committee
Loyola Marymount University, Fine Arts/Film School Council

**MEDIATOR**:

Mr. Tarter appointed by the United States Bankruptcy Court – Central District of California to its panel of mediators (1995 - present).

## Addendum to CV of Thomas A. Tarter

Qualifications:   My background involves experience with large and small banks.   Lloyds Bank California, Sanwa Bank of California and First Los Angeles Bank were subsidiaries of very large, international banks.  At Sanwa Bank and First Los Angeles Bank, I was involved in evaluating potential acquisitions that involved "healthy" and "distressed" banks. At First Los Angeles Bank, I was also involved in the purchase of loans from the F.D.I.C. and the sale of non-performing loans.

I was also involved in the formation of a savings bank and a commercial bank that were located in Los Angeles, California.  While I did not serve on the board of directors of the savings bank, I provided advice involving staffing, capital and regulatory issues to directors and senior management.  I was involved in the formation of a commercial bank – Bank of Los Angeles.  At the Bank of Los Angeles, I was involved in the acquisition of another bank that was closed by state and federal regulators, purchased loans from the FDIC and the RTC.  Issues involved in the acquisition included: deposit retention, deposit withdrawal requests, possible run on deposits, liquidity, borrower loan defaults and lender liability claims, performing and non-performing loans.  It was a complicated process that worked out positively because well-defined business and strategic plans were quickly developed and implemented.

I was also approved by regulatory agencies to serve as the chief executive officer of a financially troubled bank, Center National Bank. This assignment resulted in the identification of significant additional problems within the bank that prior to my employment had not been CUSCed by either the bank's independent auditors or by the regulators.  My duties included: Securities and Exchange Commission disclosures, valuation of the loan portfolio, amendment of financial reports, the sale of loans, shrinkage of deposits, capital infusion and implementation of new policies, procedures and controls.

Subsequent to First Alliance Mortgage Corporation ("FAMCO") filing for bankruptcy protection, I was approved and appointed with the concurrence of the board of directors, creditors and court to the board of directors of FAMCO which was a public, SEC reporting financial services company.  I served during bankruptcy proceedings as its Audit Committee, Chair. I was also appointed to serve during reorganization on the board of directors of a regional retail company.

I have served as a director of the Western States Bankcard Association and as an advisor to various financial institutions and companies involving credit card, lender liability, TILA, and UDAP issues.

I have also been appointed to the panel of mediators by the United States Bankruptcy Court for the Central District of California.

**EXHIBIT B**

**List of cases that the expert witness has testified at trial, deposition, mediation or arbitration included the following:**

1. NNNRI v Todd Mikles, et al., Irvine, CA, Arbitration 11/23;

2. Chong v Experian, Honolulu, HI, Depo 10/23;

3. LCAR Park View, LLC, et al, v Joseph Goveia, et al., Case No. 30-2020-01 148998 CU-BC-CJC, Santa Ana, CA, Dep 09/23;

4. Johnson v Freedom Mortgage, Equifax and TransUnion, Case No: 21-cv-2760 (KMH/HB), Minneapolis, Minnesota, Depo 06/23;

5. Loretta Perry vs Luxury Auto Leasing, Interstate Automobile Network, Inc. et al. Case no: LAM1003CS0606, Los Angeles, CA, Trial 05/23;

6. George and Geri Calcut vs Paramount Residential Mortgage Group, Inc. and Cenlar FSB, Case no: 2:22-cv-0123-JJT, Phoenix, AZ, Depo 04/23;

7. Albert Smith vs Reliable Chevrolet, et al., Albuquerque, NM, Depo 03/23; Trial 09/23;

8. Christopher LaRocco vs Acima Credit, LLC, Houston, TX, Case no: 4:21-cv-1770, Depo 11/22;

9. Shara Bailey vs Experian, Boise, ID, Depo 11/22;

10. Ntam vs Paramount Residential Mortgage Group, Inc and Cenlar FSB, Washington D.C., Depo 08/22;

11. Nalbandyan vs Wells Fargo Bank, Los Angeles, CA, Arbitration, 07/22;

12. Yu vs Tesla, Equifax, et al, Los Angeles, CA, Depo 04/22;

13. Balboa Capital vs Adesomo, et al, Santa Ana, CA, Trial 03/22;

14. Larios vs SLS, Victoria Grantor Trust, et al, Los Angeles, CA, Case No. 18STCP02482. Depo 01/22, Trial 03/22;

15. Hill vs Ocwen, PHH, et al, Colusa, CA, CV24409,  Depo 01/22;

16. Tayyar, et al vs OneUnited Bank, Glendale, CA, BC533326, Depo and Trial 11/21;

17. Konig, et al. vs Bank America, n.a., Equifax, TransUnion, et al, SDNY, 7{18:cv-07299-JCM, Depo 11/21;

18. Ponce, et al. vs Wells Fargo Bank and Specialized Loan Servicing, Woodland, CA, CV-13: 1769, Depo 10/20, Trial 9/21;

19. Kramer, et al vs MicroBilt, Equifax, et al, Los Angeles, CA, 5:19-1021-JGB(SPx), Depo 06/20;

20. Linda Musial vs Nationstar, et al., Riverside, CA, Depo 01/20; Trial 02/20;

21. Kato vs AutoNation, et al; Phoenix, AZ, Arb 01/20;

22. In re: Nicolas, Los Angeles, CA, 10/20 and 3/21;

23. In re: CSA and CFT, et al.; Los Angeles, CA; 1/20 and 5/20;

24. CLG, et al. vs Gunderson, Irvine, CA, Depo 11/19; Arb 12/19;

25. Franklin, et al. vs Midwest Recovery, et al.. Los Angeles, CA, 8:18-cv-02085-JLS-DFMx, Depo 11/19;

26. Cardenas vs Ally Bank, et al., Oklahoma City, OK, Depo 10/19;

27. Bryant vs Moto-Science, et al., Los Angeles, CA Depo 09/19;

28. Sponer vs Wells Fargo Bank, et al., Portland, OR, 3:17-cv-02035-HZ, Depo 7/19; Trial 08/19;

29. Neufeld vs Capital Bank, TransUnion, et al., Fresno, CA, 1:18 – cv – 01012 – LJO – SKO, Depo 7/19;

30. Cook vs Mountain America  Federal Credit Union, et al., Phoenix, AZ, Depo 3/19;

31. Hannah Weinstein vs Equifax, et al., Los Angeles, CA, 2-17-cv-8704, Depo 2/19;

32. Rowe vs Renovate America, et al., San Diego, CA, Arb 1/19;

33. Hernandez vs Ditech, SLS; et al., Glendale, CA, Depo 1/19;

34. Brainangkul vs SPS, et al., Glendale, CA, Depo 11/18;

35. Snyder vs Bank America, et al., San Francisco, CA, Depo 11/18;

36. Trabulsi vs Wells Fargo Bank, Los Angeles, CA, Depo 10/18;

37. Clark vs Vigil, Bakersfield, CA, Arb 6/18;

38. Luce vs Wells Fargo Bank, et al, San Francisco, CA, Depo 5/18;

39. Solenberger vs Northstar and Hillcrest Davidson, et al., Kansas City, KS, Depo 05/18;

40. Anderson vs Wells Fargo, et al., Dallas, TX, 3:16-cv-2514,Depo 04/18;

41. Altadena Lincoln Crossing, LLC. vs East West Bank, Los Angeles, CA, Depo 03/18; Trial 5/18, # 2:17-bk-14276-BB; Depo 12/18; Trial 1/19;

42. Hernandez vs Specialized Loan Service, San Bernardino, CA, Depo 03/18;

43. Kim vs PHEAA, et al; San Diego, CA, 17-cv-00528-WQH-AGS, Depo 02/18;

44. Yin vs Frontier Communications, et al, Los Angeles, CA, Depo 02/18;

45. Lafkas vs Lafkas, Los Angeles, CA, Depo 01/18; Trial 4/18;

46. Karapetyan vs US Bank, et al., Los Angeles, CA, Depo 01/18;

47. Robbins vs CitiMortgage, et al., San Francisco, CA, Depo 12/17;

48. TGV vs Conner, et al., Santa Ana, CA, Depo 12/17; Trial 5/18;

49. Manantan vs. Wells Fargo Bank, et al.., San Mateo, CA, Depo 11/17; Trial 03/18;

50. Favero, et al. vs. Stefanelli, et., et al., Colusa, CA, Depo 10/17;

51. GemCap, et al vs. Amalfi Capital, et al., Los Angeles, CA, BC522224, Depo 10/17;

52. Fredrickson vs Cannon Federal Credit Union, Albuquerque, NM, 2:16-cv-01012-SMV-CG, 06/17;

53. PHH vs Barrett, Daffin, et al., San Francisco, CA, Depo 6/17;

54. Al-Naswari vs FCI, et al, Anaheim, CA, Depo 3/17 and 06/17; Arb 03/18;

55. US Trust, et al vs Aroyan; et al, Irvine, CA; Arb, 01/17;

56. Weiss, et al vs Citibank; Los Angeles, CA; Depo 12/16;

57. Steiner vs Bank America. Bank New York Mellon, Bayview, et al; San Francisco, CA; Depo 11/16;

58. Krumpholtz vs Redondo Beach Board of Education; Los Angeles, CA, Trial 10/16;

59. Middleburg Bank vs Torus Law, et al; Richmond, VA, Depo 09/16; Trial 11/16;

60. Community Bank of Santa Maria vs Joni Gray; Santa Barbara, CA, Depo 07/16;

61. Dias vs PNC, et al, Auburn, CA, Trial 03/16;

62. Data Label vs  California Bank and Trust, Los Angeles, CA, Depo 3/16; Trial 03/17

63. Bresee vs Wells Fargo, et al, Phoenix, AZ, Depo 03/16;

64. Herrera vs AllianceOne, San Diego, CA; Depo 02/16;

65. Banneck vs Experian, HSBC, et al, Oakland. CA; 02/16;

66. Bodecker vs JPMorgan Chase, San Francisco, CA; Depo; 02/16;

67. Boston Private Bank vs. Foster Enterprises, et al., Depo, San Mateo, CA, 12/15;

68. Lawrence vs. J.D. Byrider, et al., Akron, OH, Arb. 12/15;

69. Jackson, et al vs. J.D. Byrider, et al., Cleveland, OH, Arb. 12/15;

70. People vs. Johnson, Santa Rosa, CA, Trial 8/15;

71. Kim vs BMW FS, et al., Los Angeles, CA, Trial 8/15;

72. Stansell vs Bank of America, et al., Marysville, CA, Depo 8/15;

73. Csmeezy, Inc. vs City National Bank, et al., Beverly Hills, CA, Depo 7/15;

74. Teamcare, et al. vs Wells Fargo Bank, et al., Los Angeles, CA, Depo 6/15;

75. Drakopoulos vs Credit Suisse, SPS, et al., Newberryport, MA, Trial 06/15 and 01/16;

76. Valdes, et al. vs Citibank, et al., Los Angeles, CA, Depo 05/15, 6/15; Trial 8/15;

77. Guerra, et al., vs Nationstar, et al., Sacramento, CA, Depo 04/15;

78. In re Tayyar, et al., Los Angeles, CA, Depo 04/15; Trial 05/15, # 2:13-bk-37454-WB;

79. Gustafson vs. SST, et al, Los Angeles, CA, Depo 03/15;

80. Thomasian vs Wells Fargo Bank, et al.  Portland, OR,  Depo  03/15;

81. MCWE vs Compass Bank, et al, San Diego, CA , Depo 02/15; Trial 8/15;

82. In re Duncan and Dirk, et al., Los Angeles, CA, Trial 12/14, # 2:14-bk-19628-ER;

83. Morvant vs Eastern Savings Bank, et al, Salt Lake City, UT, Depo 11/14; Trial 12/16;

84. Raima vs Wells Fargo Bank, Los Angeles, CA, Arb, 10/14;

85. In re Laube, et al., Woodland Hills, CA, Trial 10/14, # 1:13-bk-17331-VK and 17332-VK;

86. Linza vs PHH Mortgage, et al, Marysville, CA, Trial 07/14;

87. Corona, et al vs Heritage Oaks Bank, et al., Santa Barbara, CA, Depo 07/14; Trial 09/14;

88. Capil vs Mega Life, et al., San Jose, CA, Depo 06/14;

89. In re AJK Gadsen vs Sovereign Bank, et al, Woodland Hills, CA, Depo 05/14; Trial 06/14, Adv Case No. 1:13-ap-01174-MT (Related Bankruptcy Case No. 1:13-bk-12836-MT;

90. Carrillo vs Chase, et al,  Riverside, CA, Depo 04/14;

91. UGS vs Pacific Shores, San Jose, CA, Depo, 04/14;

92. In re Fox, Santa Ana, CA, Trial 01/14, # 8:11-bk-10501-ES;

93. Squatrito vs CSS, Chatsworth, CA, Trial 01/14;

94. In re Hargett, Santa Ana, CA, Trial 01/14, 8:11-bk-19495-TA;

95. In re Gonzalez, Santa Barbara, CA, Trial 12/13, # 9:12-14445-RR;

96. LWL Investments, LLC vs Universal Bank, et al., Los Angeles, CA, Depo 11/13;

97. Indymac Ventures, LLC vs Anyia, et al., Los Angeles, CA, Depo 10/13; Arb 10/13;

98. Peters vs Discover, et al., Los Angeles, CA, Depo 9/13;

99. In re Kerr, et al, San Diego, CA, Trial 06/13, # 12-90204;

100.   In re Bacino, FDIC, as Receiver for La Jolla Bank vs Birger Greg Bacino, San Diego,;

101.   Laurelwood Group, LLC vs. East West Bank, et al., Los Angeles, CA, Depo 05/13;

102.   Verdiyan vs Capital One, et al, San Francisco, CA, Depo 04/13;

103.   In re: Ortega, Santa Barbara, CA, Trial, 3/13, # 9-10-bk-12324 RR;

104.   Bacarti vs JPMorgan Chase, et al, Los Angeles, CA, Depo 3/13;

105.   Kim vs JPMorgan Chase, et al, Los Angeles, CA, Depo 3/13;

106.   Chang and Wong vs. Hanmi Bank, et al., San Jose, CA, Depo 2/13, Trial 06/13;

107.   Downs, et al vs. Wells Fargo Home Loan, et al., Reno, Nevada, NV, Depo 1/13;

108.   Gaudie vs Countrywide, et al., Chicago, IL, Depo 12/12;

109.   Evans vs Trope, et al, Los Angeles, CA, Depo 11/12;

110.   Khazra vs Shayan, Los Angeles, CA, Trial 10/12;

111.   FDIC as Receiver for Union Bank, N.A. vs Prudential, et al., Phoenix, AZ, Depo 8/12;

112.   FDIC as Receiver for La Jolla Bank vs O'Connor, et al., San Diego, CA, Depo 7612;

113.   The Preserve, LLC vs Centerpoint, et al,. Los Angeles, CA,  Depo 05/12, # 2:10-ap-01296-BB and 2-10-bk-18248-BB;

114.   Valencia Dodge vs Mikaelyan, Chatsworth, CA, Depo 04/12; Trial 10/12;

115.   In re: Krishan, LLC, San Jose, CA, Trial 04/12, # 10-50824-SLJ;

116.   Shoreline vs. Union Bank of California, Los Angeles, CA, Depo 04/12;

117.   Utah First Federal Credit Union vs. Federal Insurance, et al., Salt Lake City, UT, Depo 02/12;

118.   Lopez, et al., vs. Wells Fargo Bank, et al., Los Angeles, CA, Depo 02/12;

119.   Anderson vs. Chase, et al., San Diego, CA, Depo 01/12;

120.    United States vs. Sutherland, et al., Las Vegas, NV, Trial 01/12;

121.   Dillon vs. Chase, et al, Charleston, WV, Depo, 12/11; Trial 02/12;

122.   Triano vs. Summit Bank, et al, Oakland, CA, Depo 11/11;

123.   Wells Fargo Bank vs White, Los Angeles, CA, Depo 11/11; Trial 05/12

124.   Oxford Street Properties, LLC vs. Lance Robbins, et al, Depo 10/11;

125.   In re: Tarkanian, et al,. San Diego, CA, 09/11, # 10-cv-0980-WQH(BGS);

126.   Mueller vs Wells Fargo Bank, San Francisco, CA, Trial 09/11;

127.   Amezcua, et al vs. East West Bank, San Jose, CA, Depo 08/11; 09/11;

128.   In re: The Preserve, LLC, Los Angeles, CA, Depo 08/11; Trial 08/11 and 10/11, # 2:10-ap-01296-BB and 2-10-bk-18248-BB;;

129.   Kim, et al vs. CCU, et al, Las Vegas, NV, Depo 07/11;

130.   Jacob vs. SDG&E, San Diego, CA, Mediation, 06/11;

131.   TomatoBank vs East West Bank, Los Angeles, CA, Depo 07/11;

132.   Held vs. Gilmore Bank, Santa Ana, CA, Depo ,06/11; Trial 07/11;

133.   Trapasso and Justice vs Romero, et al, Stockton, CA, 05/11;

134.   In re: Pacific Allied, Los Angeles, CA, Trial 03/11, # 2:10-bk-42788 BB

135.   Price vs Eller, et al. Riverside, CA, Trial 03/11

136.   John Doe vs Church of Latter Day Saints, et al; Los Angeles, CA, Depo 02/11

137.   Empire Merchandizing vs. Bank Rhode Island, Providence, Rhode Island, Depo 02/11; Trial 02/11.

138.   United States of America vs. 718 West Wilson, et al, San Diego, CA, Depo 01/11

139.   Dufour vs. Informative Research, et al, Garden Grove, CA, Depo 01/11

140.   Amex vs Alexander Max, et al, Rockville, MD, Depo 10/10

141.   Umpqua Bank vs Larmont, et al, Sacramento, CA, Depo 10/10

142.   In Re:  Mammoth Arrowhead 1, LLC, Phoenix, AZ, Trial 09/10,

143.   D. Alexander vs Anderson, et al, Los Angeles, CA, Depo 08/10

144.   In re: Quarry Pond, LLC, et al, San Francisco, CA, Trial 06/10, # 09-33426

145.   Abdi vs Mulhearn, et al, Los Angeles, CA, Arb 06/10

146.   Lovett vs Citibank, et al, Los Angeles, CA, Depo 05/10; Trial 10/10; 5/12

147.   Charon Solutions, Inc. vs Jensen, et al, Los Angeles, CA, Depo 05/10

148.   Faye Estates, LLC vs Eastern Savings Bank, Los Angeles, CA, Depo 04/10; Trial 04/13

149.   Zey vs Dyck-O'Neal, et al, St. Louis, MO, Depo 04/10

150.   In re: Mendoza, et al, Santa Rosa, CA., Trial 04/10, # 09-11678-AJ

151.   In re: Bacchus, et al, Santa Ana, CA, Depo 02/10; Trial 02/10, Case Number: 08 - 197457-RK jointly administrated with Case Numbers: 8:09-19450-RK and 8:09-15462-RK

152.   Matthews vs Chase, et al, Jacksonville, FL, Depo 02/10

153.   DeWitt vs Monterey Insurance company, et al., San Diego, CA, Depo 02/10; Trial 04/10

154.   Jung vs Hamni Bank, et al., Los Angeles, CA, Depo 01/10

155.   Garcia vs Triton Acceptance, Los Angeles, CA, Depo 12/09; Trial 12/09

156.   CNA, et al vs Lloyds, et al, Chicago, CA, Depo 11/09

157.   Hickerson vs Financial Freedom, et al, Ventura, CA Depo 11/09; Trial 09/11;

158.   Perry vs Mega Life, et al., Phoenix, AZ, Depo 11/09

159.   In re: McBride's RV Storage, LLC., Riverside, CA, Depo 10/09; Trial 10/09, # 6:09-bk-11279-BB

160.   Cartwright vs CMI, WSFS, Experian, et al. Los Angeles, CA, Depo 09/09; 10/09; 12/09

161.   Miller, et al vs. Norton Financial, Greer, Safe Harbor Financial, et al. San Diego, CA, Depo 09/09; Trial 05/10

162.   Petty vs Petty, Jackson, CA, Trial 08/09

163.   Marcus vs Vorspan, et al, Los Angeles, CA, Depo 07/09; Arb 08/09

164.   Hwang vs Fang Fashion, et al, Los Angeles, CA, Depo 06/09

165.   Elie vs Smith, San Mateo, CA, Depo 06/09

166.   In re Waterstone, LLC, et al, Reno, NV, Trial 06/09. # BK-N-08-50954-GWZ

167.   Heil Construction, Inc., vs Security Pacific Bank, et al., Bakersfield, CA, Depo 05/09

168.   UJV, et al vs Lewis, Jennings, Ross, et al. Grand Rapids, MI, Depo 02/08; Trial 04/09

169.   Blackburn vs. Duckor, et al, San Diego, CA, Dep 03/09; Arb 03/09

170.   Holly Young vs Bigelow, Los Angeles, CA Depo 03/09; Trial 06/09

171.   Levenson vs WaMu, et al., Los Angeles, CA, Depo 01/09; Arb 05/09

172.   Drury - Countrywide, et al., Tampa, FL, Depo 10/08

173.   Karen Cappuccio vs Countrywide, et al, Philadelphia, PA, Trial 09/08

174.   Mark Anderson vs WaMu, et al, San Diego, CA, Depo 09/08

175.   Ellis vs PHEAA, KeyBank, et al, Los Angeles, CA, Depo 07/08

176.   Quinn vs Cherry Lane Auto, et al, Spokane, WA, Trial 06/08

177.   In re I-5 Social Services Corporation, Debtor, Fresno, CA, Depo 05/08, # 07-13032-A-11

178.   Walsh et al vs Bank of Petaluma, et al, Santa Clara, CA, Depo 04/08; Trial 09/08

179.   Gorman vs HSBC, Experian, et al, New York, NY, Depo 04/08

180.   Shokatz vs Better Business Financial Services, Kelly Lucas & Pacifico LLP, et al, Milwaukee, WI, Depo 03/08

181.   Austin vs HSBC, et al, San Diego, CA, Depo 03/08

182.  Melton vs Friend, et al, Santa Ana, CA, Depo 01/08

183.  OES vs West Coast Bank, et al, Portland OR, Trial 01/08

184.  Michigan First Credit Union vs CUMIS, et al, Detroit MI, Depo 12/07; Trial 01/09

185.  Ligon vs Chase, et al, Dallas, TX, Depo 11/07

186.  Williams vs. AutoNation, Los Angeles, CA, Depo 11/07; Trial 12/07

187.  Weldon vs. Launch Marketing Concepts, Inc., Los Angeles, CA, Depo 11/07; Arbitration 12/07

188.  Arnold vs LNR, Los Angeles, CA, Depo 10/07

189.  Squirty's Collision, et al vs Finishmaster, et al, Depo 09/07; Trial 09/07

190.  Casey vs US Bank, et al, Santa Ana, CA, Depo 09/07; Trial 10/07

191.  Nardelli vs MetLife, et al, Phoenix, AZ, Depo 09/07; 08/08; Trial 03/09

192.  Cha, et al vs WFB, et al, Los Angeles, CA, Depo 08/07; Trial 09/07

193.  Ho, et al vs Wells Fargo Bank, et al, Los Angeles, CA, Depo 08/07; Trial 08/08

194.  Ott vs Markley Group, et al, Los Angeles, CA, Depo 06/07

195.  Hayden vs. Hayden, Los Angeles, CA Arbitration 05/07

196.  Nelson vs. Arrow Financial Services, et al, Los Angeles, CA, Depo 04/07; Trial 05/07

197.  Foppiano vs. Union Bank of Stockton, et al, Sacramento, CA, Depo 04/07

198.  Board of Health Dept vs Virginia Jefferies, et al, Mansfield, OH, Depo 04/07

199.  DeLuna vs Bank America, Los Angeles, CA, Depo 12/06; Trial 06/07

200.  Pertiera vs Bank America, Los Angeles, CA, Depo 12/06

201.  United States vs. Flores, Los Angeles, CA, Trial 12/06

202.  Lehman vs Net Bank, et al, Indianapolis, In, Depo 12/06

203.  Kay vs. Washington Mutual, et al., Sacramento, CA, Depo 09/06

204.  Loudd vs. Weston, Conseco, GreenTree, et al., Los Angeles, CA, Trial 09/06

205.  Associated Bank, et al vs Brady Martz, Minneapolis, MN, Dep 0906

206.   Satey vs Chase Manhattan Bank, et al, Los Angeles, CA, Dep 08/06

207.   1124 Marilyn Drive Development, LLC vs Elyaszadeh, Los Angeles, CA, Dep 04/06; Trial 07/06

208.   Paradigm Industries, Inc. vs Yang, Wells Fargo Bank, et al., Los Angeles, CA, Dep 03/06; trial 04/06

209.   Bank of America vs Mark Guzy, et al, San Francisco, CA, Dep 03/06

210.   First State Bank of Taos, et al. vs Close, Albuquerque, NM, Dep 02/06

211.   Neumann, et al. vs. Friedland, et al, San Jose, CA, Dep 02/06

212.   Babijian, et al vs Union Bank of California, Los Angeles, CA, Dep 01/06

213.   Bistro Executive, Inc., et al, vs Rewards Network, Inc., et al, Dep 01/06

214.   Lu, et al, Los Angeles, CA, Arbitration, 11/05

215.   Fisher vs Wells Fargo Home Mortgage, et al, Los Angeles, CA Dep 11/05, Trial 04/07

216.   Turner vs Washington Mutual, et al, Los Angeles, CA Dep 11/05

217.   Accurate Air Engineering vs Bank of America, Los Angeles, CA, Dep 11/05

218.   Las vs Washington Mutual, Las Vegas, NV, Dep 09/05, Arbitration 01/06

219.   Dante Valve Company, Inc, et al vs Bank of America, Los Angeles, CA, Dep 08/05

220.   Amada America, et al vs Bank of America, Los Angeles, CA, Arbitration, 05/05

221.   Green vs Vars, et al, Los Angeles, CA, Dep 04/05

222.   White vs White, et al, Riverside, CA, Dep 03/05

223.   Sherman, Abrunzo vs Stricklands, Aaron & Jacqueline and Estate of Albert Thompson, et al, Chatsworth, CA, Trial 02/05, No. PC 033244-V

224.   Harman vs California Federal Bank, et al, Van Nuys, CA, Dep 1/05, Trial 2/05, No. LC059430

225.   Reizian vs Mehrdad Arya, Global Capital Group, Inc,, The Escrow Group, et al, San Diego, CA, Trial 02/05, No. GIC 819536

226.   Barry vs California Bank and Trust, et al, Orange County, CA, Dep 01/05, No. 04CC04393

227.  Norma Berneman, et al vs. Ira Shear, Bank of America, et al, Los Angeles, CA, Dep 9/04 BC 278 601

228.  Invelj, Inc. vs AMK Management, Inc., et al, Van Nuys, CA, Trial 07/04 02E08010

229.  Federal Insurance Corporation and Plum Creek Marketing, et al vs Bank America, Cal Fed, et al, Ventura, CA, Dep 06/04 CIV 215700

230.  Barbara San Martin vs. Antioch Credit Union, Martinez, CA, Dep 05/04

231.  Humbolt Bank, et al  vs Gulf Insurance Company, San Francisco, CA, Dep, 05/04 C03-1799 SC ARB

232.  Vasquez, et al vs Beneficial Finance, Portland, OR, Trial 01/04

233.  United Grand vs Farmers & Merchants Bank, et al, Long Beach, CA, Dep 01/04, No. BC296270

234.  Commercial Programming Systems, Inc. vs Briggs & Baker, et al, Los Angeles, CA, Dep 12/03; Trial 02/04

235.  Ferrera vs Henry C. Hansel, Inc., et al, Santa Rosa, CA, Dep 12/03, No. 231480

236.  Beach, et al vs Bank of America, et al, San Francisco, CA, Dep 11/03

237.  Aquino vs Providian, Fresno, CA, Madera County No. CV18758, Dep 10/03

238.  Martinez vs Onyx Acceptance Corporation, et al, Fresno, CA, Trial 8/03

239.  FFS, et al vs Bank of Saipan, Abilene, TX, Dep 7/03; Trial 04/05

240.  SoCal Housing Partners, LLC vs Gregory S. Hancock, Darrell Hoover, et al, Los Angeles, CA, Depo 6/03

241.  Anthony Kalajian vs. Patricia Dubon, Aames, et al, Los Angeles, CA, Dep 5/03

242.  Wells Fargo Bank vs Peter Knibb, et al, Los Angeles, CA, Dep 5/03

243.  Spectrum Glass and Aluminum, Inc., et al vs People's Bank of California, et al, Los Angeles, CA, No. EC – 033501, Dep 3/03

244.  Nilchin vs Cohen, et al, Los Angeles, CA, Trial 3/03

245.  Luther vs Bank of America, Moreno Valley Honda, et al, Riverside, CA, Dep 01/03

246.  Corbett vs Bank of America, Hayward Dodge, et al, Oakland, CA, Dep 11/02, 12/02

247.  Costa vs Fresno Surgery Center, et al, Fresno, CA, Dep 10/02; Trial 11/02

248.   Bank of America, et al vs Prime One Capital, Bridgeport, CN,  Federal Court, Trial 10/02

249.   California Federal Bank vs Russell Crawford, et al, Los Angeles, CA, No. BC – 144590, Trial  9/02

250.   INET Interactive Network System, Inc., Debtor-in-Possession, Plaintiff, vs Global Crossing Bandwidth, Inc., fka Frontier Communications of the West, Inc., Defendant, No. LA 01-13671-KM, Dep 9/02

251.   Alaska Petroleum Environmental Engineering vs Antiquarian Traders, et al, Los Angeles, CA, No. LASC BC 260006, Trial 8/02

252.   Global Interactive Marketing, et al. vs Joseph Clark, United Nevada Trade International, et al., Los Angeles, CA, No. SC 059148, Dep 7/02, Trial 3/03

253.   Grumbo vs Bretz, Los Angeles, CA, No. SC 059095, Dep 7/02

254.   Sam Carroll and GOCO Acquisition Corp. vs German American Capital, et al., Birmingham, AL, No. 01-T-981-5, Federal Court, Dep 6/02

255.   Duran vs. Citicorp, Santa Clara, CA, No. CV-790369, Dep 6/02

256.   Fyke and Falcone vs. Screen Shop, Santa Clara, CA, Trial 5/02

257.   Bill's Quik Stop vs West America Bank, et al., Fresno, CA, Dep 5/02

258.   Krantz vs Philpott, et al., Los Angeles, CA, Dep 1/02

259.   Bank of America vs San Ramon Carriage Co., Inc., et al, Contra Costa County, CA, No. C00-04854, Dep 10/01; Trial 11/01

260.   David Kim vs California Korea Bank, No. BC108719, Los Angeles, CA, Trial 8/01

261.   Spring Mountain Homes, et al vs Upland Bank, American Arbitration Association No. 72-110 00981, Upland Bank - MJE, Los Angeles, CA, Arbitration 8/01

262.   Viva Tiger, Inc. vs Cathay Bank, Pasadena, CA, Dep 6/01, Trial 7/0;

263.   Marine Village Townhomes Association vs Hawthorne Savings and Loan, No. YC 032 949, Los Angeles, CA, Dep 5/01;

264.   Abatti vs Floyd, et al, Imperial, CA; SC case No. 89994Dep 3/01, Trial 5/01;

265.   Lee vs Bank of America, Los Angeles, CA; Dep 1/01, Trial 2/01;

266.   EIE Guam Corporation vs The Long Term Credit Bank of Japan, Ltd., et al., United States District Court of Guam, Territory of Guam, No. 00-00009; Dep 11/00; 12/00;

267.   In re:  Cimms, et al, Los Angeles, CA;

268.   Kroupa vs Sunrise Ford, AT&T, et al, Los Angeles, CA; ECO 14965, Trial 11/00

269.   Reyes vs Car Gallerie, et al, United States District Court, Los Angeles, CA;  CV -00-5673-MWB; Trial 10/00

270.   Bank of America vs Larry Whithorn; Riverside, CA, RIC 310840; Dep 9/00

271.   Kane vs Capital One, et al; GIC733574; San Diego, CA; GIC 733574; Dep 8/00

272.   Larry Nix, et al vs Westcorp, et al.; Los Angeles, CA; BC 204188; Dep 8/00

273.   Coast Business Credit vs Roger Hay, Ken Campbell, et al.; Orange County Superior Court; No. 787394; Dep 5/00

274.   Hanna vs American Dream Equity Home Loan Corporation; Los Angeles, CA; EC026426;    Dep 2/00

275.   Life Benefactors, LP vs Transamerica, et al;  San Diego, CA;  723176;  Dep  1/00;  Trial 3/00

276.   Peter Ligeti vs Advanta National Bank;  Santa Clara, CA;  CV 770626;  Dep 11/99

277.   Ambriz, et al vs Greentree Financial;  Elko, NV;  #29128;  Dep 10/99;  Trial (A) 11/99

278.   In re: Nellis Arms Apartments;  Las Vegas, NV;  99-12278 LBR;  Dep 9/99;  Trial 9/99

279.   B&B Sons Enterprises, Joseph and Nancy Benvenuti vs La Salle National Bank, et al; Sacramento, CA;  # 74-Y148-0181-98;  Dep  6/99;  Trial (A)  6/99

280.   Davina Willis vs J. G. Wentworth SSC;  San Francisco, CA;   Dep  8/99

281.   Davis vs A&L, et al;  Riverside, CA;  273753;  Dep  6/99

282.   In re:  Crystal Properties, Ltd;  San Fernando Valley, CA;  SV 97-18796-KL; Dep 5/99; Trial  7/99

283.   In re:  Maroa Park Apartments;  Modesto, CA;  98-95624-A-4;  Dep 6/99;  Trial  8/99 `

284.   Ohai vs WHC-Three Investors, The Archon Group, et al;  Los Angeles, CA; AAA Case No 72-1480039098;  Trial (Arbitration)  3/99

285.   In re: Florence, et al;  Las Vegas, NV;  Dep  1/99

286.   Ambassador Hotel Co. LTD vs Wan Yuan Lin, et al;  Los Angeles, CA;  No 176479; Dep  2/99

287.   Wendell vs Wells Fargo Bank; San Francisco, CA;  983597;  Dep 4/99

288.  Bragg vs Hawthorne Savings Bank;  Los Angeles, CA;  Trial  11/98

289.  Rosario Sobremonte; Amparo Esperidion, et al vs Bank of America;  Los Angeles, CA;  BC 127133;  Dep 9/98

290.  Finnocario, et al vs Wells Fargo Bank, et al, Los Angeles, CA, Depo est 09/98

291.  Yang, et al vs Bank of America;  Los Angeles, CA;  Los Angeles;  VC 020377;  Dep 3/98 est

**292.**  EMC Mortgage Co., et al vs Christensen, et al;  Fresno, CA; Trial 2/97 est

293.  Fuchs and Marshall, et al vs Hwai-Tang Chen, et al ;  Santa Monica, CA;  SC047845;  Trial 11/98 est

294.  Union Oil Company of California vs Mobil Oil;  Los Angeles, CA;  Dep 10/98est;  Trial 11/98 est

295.  Tillman Fabric, Inc vs New Progress Enterprise Co., et al;  Los Angeles, CA;  BC 161449;  Trial   7/98

296.  Budak vs Grossman;  Los Angeles, CA;  Dep --/97 est;  Trial (Arbitration)  --/98

297.  Imperial Bank vs Robert Selan, et al;  Los Angeles, CA;  LC038665;  Dep --/98 est

298.  Sukow vs Republic Western Insurance Company, et al;  Los Angeles, CA;  BC 142792;  Dep --  /98 est

299.  In re. Silveira, et al;  Modesto, CA;  96-92575; Trial  11/96

300.  In re. Playa Pacifica, et al;  Santa Ana, CA;  SA96-11937-JW;  Dep 10/96

301.  Federal Deposit Insurance Corporation vs BMB Properties, et al: Los Angeles, CA;  C 669033 consolidated into C 669294;  Dep 8/97;  Trial 9/97

302.  Quiter/Nikkel vs Watsonville Cogeneration Partnership, State Street Bank and Trust Company of California and Ford Motor Credit Company, et al;  San Francisco, CA;  969360;  Dep 5/97;  Trial   6/97

303.  Takaki vs Hawthorne Savings Bank;  Los Angeles, CA;  YC 021815 Dep  4/97 est. and 2/99;  Trial  6/97 and 3/99

**304.**  The Official Oversight Committee vs Levene & Eisenberg, Alliance Bank, et al; Santa Barbara, CA;  213552;  Dep  10/97

305.  Bilma Sadah vs Wells Fargo Bank, Chemical Bank, et al  Los Angeles;  YC 025096;  Dep 10/98 est;  Trial 3/99

306.  Kertesz vs Home Savings of America; Santa Monica, CA; SC 037986; Dep  9/97

307.   O.T. vs Valle Verde Foods; Los Angeles, CA; Trial (Arbitration) 11/97 est

308.   Monarch Bank, et al; Santa Ana, CA; Dep 6/97

309.   Patel vs Pacific Inland Bank; Los Angeles, CA; LC 018345;  Dep 97 est

310.   Hughes vs Home Savings Association, et al; Santa Barbara, CA; 211477; Dep 1/97; Trial 3/ 97

311.   Beck Oil, Inc vs Bank of America; Los Angeles, CA;  Dep 2/97;  Trial 3/97

312.   In re: Hansohl, Inc., et al; Los Angeles, CA;  Dep  1/97

313.   Tokai Bank of California vs KSS Real Estate Group, et al;  Los Angeles, CA; BC131203;   Trial 6/96

314.   Powertrain, et al vs Haifa; Santa Ana; CA;  Trial  7/96 est

315.   In re: Maulhardt Industrial Center; Santa Barbara, CA; ND 95-15475-RR;  Trial   5/96

316.   Guny vs Lieb, et al;  Ventura, CA;  114052;  Trial --/96

317.   Tillack & Co., Ltd vs Diane Tubergen, Wells Fargo Bank, The Sanwa Bank of California, et al BC  058825; Los Angeles, CA; Dep --/94;  Trial (Arbitration) 4/96 est

318.   Timothy Watson vs The Downey Venture, et al; Los Angeles, CA;  BC  098430; Dep --/96 est

319.   Farnon vs World Savings, Santa Monica Bank, Argus, et al;  Los Angeles, CA;  LC 022237;  Dep 5/95:  Trial  7/95

320.   First American Title Company vs Bank of America, et al;  Los Angeles, CA;  BC 098416  Dep est. 1995

321.   Hanmi Bank vs Kim, You, et al;  Los Angeles, CA;  Dep  --/95

322.   Mosely vs Farmers and Merchants Bank; Los Angeles, CA;  NC 012950; Dep --/95 est

323.   Pelletier vs Behrens, et al; Los Angeles, CA;  CV  890969-RMT    Dep est 1995; Trial 11/99

324.   In re. Gatway Properties, et al  and  The  Alicante Management Co, et al; Santa Ana, CA; SA95-10963JR and 95-12694JR;  Trial est 95

The aforementioned list may be supplemented in the event that a matter(s) was inadvertently omitted.  Dates have been estimated to the best of my recollection.

# EXHIBIT B

```
1              UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
2
     Civil Action Number 2:22-cv-06718-AB-MAAx
3
     JOSHUA JOHNSON,
4
          Plaintiff,
5
     vs.
6
     JPMORGAN CHASE BANK, N.A.,
7
          Defendant.
8
     ----------------------------------------------------------
9
          REMOTE VIDEO DEPOSITION OF THOMAS A. TARTER
10
                        December 4, 2025
11
     ----------------------------------------------------------
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                             Page 1
```

```
 1                 A P P E A R A N C E S
 2    PRO SE:
           JOSHUA JOHNSON, ESQ.
 3         2201 5th Street, Unit 208
           Santa Monica, California 90405
 4         Phone:  336.423.2594
           Email:  josh@jj88.org
 5
      ON BEHALF OF THE DEFENDANT:
 6         ABIRAMI GNANADESIGAN, ESQ.
           Dykema Gossett LLP
 7         444 South Flower Street, Suite 2200
           Los Angeles, California 90071
 8         Phone:  213.457.1800
           Email:  agnanadesigan@dykema.com
 9
      Also Present:
10         Fritz Sperberg, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

1          PURSUANT TO WRITTEN NOTICE and the appropriate

2     rules of civil procedure, the remote video deposition

3     of THOMAS A. TARTER, called for examination by the

4     Defendant was taken by remote means at commencing at

5     10:07 a.m. Pacific Time on December 4, 2025, before

6     Kirsten M. Thorngate, Registered Professional Reporter

7     within and for the State of Colorado.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page  3

```
 1                    I N D E X
 2
      EXAMINATION:                                        PAGE
 3
            By Ms. Gnanadesigan                              7
 4
            By Mr. Johnson                                 105
 5
            By Ms. Gnanadesigan                            162
 6
 7
      DEPOSITION EXHIBITS:
 8
      Exhibit 1      Plaintiff Joshua Johnson's Expert      31
 9                   Witness Disclosure Pursuant to
                     FRCP 26(a)(2)
10
      Exhibit 2      Subpoena                               38
11
      Exhibit 3      Complaint                              54
12
      Exhibit 4      Transcript, Johnson v. Chase           66
13                   Hearing on 6-8-21
14    Exhibit 5      Transcript, transcript, AAA            85
                     hearing, 7/15/21
15
      Exhibit 6      Pre-Hearing Brief                      98
16
      Exhibit 7      Ink and Sapphire payment summary      109
17
      Exhibit 8      Sapphire statements                   115
18
      Exhibit 9      CFPB Investigation Response,          119
19                   10/14/20
20    Exhibit 10     Online Profile Alerts                 124
21    Exhibit 11     Email to Johnson from Chase,          126
                     7/23/11, Subject:  Your Credit Card
22                   Payment is Due Alert from Chase
                     Case Services
23
      Exhibit 12     Email to Johnson from Chase,          127
24                   2/8/18, Subject:  Your Credit Card
                     Payment is Due Alert from Chase
25                   Case Services


                                                      Page  4
```

```
 1      Exhibit 13    Email to Johnson from Chase,          128
                      8/8/17, Subject:  Your Credit Card
 2                    Payment is Due Alert from Chase
                      Case Services
 3
        Exhibit 17    Payment due alert index              129
 4
        Exhibit 14    Paperless statement notification     131
 5                    example email
 6      Exhibit 15    Business profile screenshot          132
 7      Exhibit 16    Excerpt, Kopecki transcript          134
 8      Exhibit 18    Screenshots of internal Chase        140
                      system
 9
        Exhibit 19    Transcript, telephone call between   145
10                    Willis and Johnson, 10/20/20
11      Exhibit 20    Consolidated 2018 call transcripts   147
```

```
12
        ** STENOGRAPHER'S NOTE: All quotations from exhibits
13      are reflected in the manner in which they were read
        into the record and do not necessarily indicate an
14      exact quote from the document.
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | | |
|---|---|---|
| 1 | through -- I guess it was October of 1968.  During | 10:46 |
| 2 | that period of time, I attended the Army Officer | 10:46 |
| 3 | Candidate School and the Army basic finance course, | 10:46 |
| 4 | which included finance and accounting issues.  The OCS | 10:46 |
| 5 | training was mainly with leadership and | 10:46 |
| 6 | military-related subjects. | 10:46 |
| 7 | In 1968, after I left the Army, I was | 10:46 |
| 8 | enrolled at Santa Clara University, and I continued my | 10:46 |
| 9 | education there.  I was -- for a brief period of | 10:46 |
| 10 | time -- it's not on my resume -- in the internal audit | 10:46 |
| 11 | and accounting department at Fairchild Semiconductor, | 10:46 |
| 12 | but I began after the Army my professional career. | 10:46 |
| 13 | While I was in the United States Army, I | 10:46 |
| 14 | served as the ex officio member of the Fort Ord Credit | 10:46 |
| 15 | Union for approximately a year, and I left the board | 10:46 |
| 16 | in my official capacity when I left active service. | 10:46 |
| 17 | In 1969, I began my banking career, and | 10:46 |
| 18 | that initially involved a training program involving | 10:46 |
| 19 | both consumer and commercial credit.  My | 10:46 |
| 20 | responsibilities were primarily involving the | 10:46 |
| 21 | commercial credit, but I also was involved in direct | 10:46 |
| 22 | and indirect financing programs and involving consumer | 10:46 |
| 23 | credit, consumer loan portfolios largely involving | 10:46 |
| 24 | mortgages and auto-related financing. | 10:46 |
| 25 | And I was not a member of the loan | 10:47 |

Page 14

| | | |
|---|---|---|
| 1 | committee at Lloyds Bank California where I served | 10:47 |
| 2 | from 1969 through the end of 1975.  I left Lloyds Bank | 10:47 |
| 3 | California as a vice president and went to the San | 10:47 |
| 4 | Juan Bank of California where I was the senior credit | 10:47 |
| 5 | officer for Southern California, a member of the | 10:47 |
| 6 | officer's loan committee, and normally an invited | 10:47 |
| 7 | participant in the bank's agency and the bank's direct | 10:47 |
| 8 | loan committees. | 10:47 |
| 9 | I was involved in setting policies and | 10:47 |
| 10 | reviewing procedures and risk management pertaining to | 10:47 |
| 11 | both consumer as well as commercial credits, and that | 10:47 |
| 12 | also involved the review of credit reports. | 10:47 |
| 13 | While at Lloyds Bank -- I forgot to | 10:47 |
| 14 | mention -- I had developed a scoring model, a very | 10:47 |
| 15 | rudimentary model, for the approval of consumer | 10:47 |
| 16 | credits that were being originated by indirect | 10:47 |
| 17 | financing sources.  That would be normally related to | 10:47 |
| 18 | auto financing or mortgage financing. | 10:47 |
| 19 | I left the San Juan Bank of California | 10:47 |
| 20 | and went to First Los Angeles Bank where I was a | 10:47 |
| 21 | member of the loan committee -- office loan committee | 10:47 |
| 22 | and a regional vice president. | 10:47 |
| 23 | There was a short, approximately | 10:47 |
| 24 | three-week, span between leaving the San Juan Bank of | 10:47 |
| 25 | California and joining First Los Angeles Bank where I | 10:47 |

Page 15

| | | |
|---|---|---|
| 1 | went to a bank called Surety National Bank.  However, | 10:47 |
| 2 | upon arrival, I discovered that there were some | 10:47 |
| 3 | significant, I would call, regulatory issues, and I | 10:47 |
| 4 | contacted the Office of the Comptroller of the | 10:47 |
| 5 | Currency and the FDIC, informed them of my concerns | 10:47 |
| 6 | and resigned and immediately went to First Los Angeles | 10:47 |
| 7 | Bank as, as I said, a vice president and regional vice | 10:47 |
| 8 | president. | 10:47 |
| 9 | During that period I was involved in | 10:47 |
| 10 | consumer credit, commercial credit, and direct and | 10:47 |
| 11 | indirect as well as in credit reporting and the | 10:47 |
| 12 | development of policies and procedures. | 10:47 |
| 13 | I would like to mention that all -- with | 10:47 |
| 14 | all of the banks that I was involved with, I was | 10:47 |
| 15 | involved with the development of policies and | 10:47 |
| 16 | procedures relating to, among other things, commercial | 10:47 |
| 17 | and consumer credit.  However, each of those banks, | 10:47 |
| 18 | and all the banks that I work with, had a | 10:47 |
| 19 | participative process where no one person was the | 10:47 |
| 20 | drafter.  It was a participative process where | 10:47 |
| 21 | credit-related policies and procedures, including | 10:47 |
| 22 | credit reporting and compliance, were circulated among | 10:47 |
| 23 | the members of the loan committee as well as other | 10:47 |
| 24 | senior officers and individuals in -- with | 10:47 |
| 25 | departmental responsibilities at the bank trying to | 10:47 |

Page 16

```
 1    come up with a collaborative best-that-we-could policy        10:47

 2    and procedure and periodically made changes and               10:47

 3    adjustments.                                                   10:47

 4              In 1979, the end of '79, I resigned from            10:47

 5    First Los Angeles Bank and became involved with the           10:47

 6    organization and the founding of Bank of Los Angeles          10:47

 7    where I was to be the president and CEO and member of         10:47

 8    the board of directors.                                        10:47

 9              The first year and a half, two years,               10:47

10    involved recruiting a staff as well as working with           10:47

11    the regulators in obtaining regulatory approval and           10:47

12    recruiting a staff of personnel and developing                10:47

13    policies and procedures for the bank that was opened          10:47

14    in May, I believe it was, 1982.                                10:47

15              I remained as the president and CEO,                10:47

16    member of the loan committee, directors loan                  10:47

17    committee, as well as supervising the officer's loan          10:47

18    committee and the staff.  And that involved reviewing         10:47

19    policies and procedures pertaining to the origination         10:47

20    approval of credit as well as credit reporting.               10:47

21              I left First Los Angeles -- I mean Bank             10:47

22    of Los Angeles, I believe it was, sometime around            10:48

23    September of 1984 and went to a bank with the approval        10:48

24    of the Office of the Comptroller of the Currency and          10:48

25    the FDIC.                                                      10:48
```

Page 17

1    It was considered to be a troubled bank.    10:48

2    I went in.  They were in the midst of a public    10:48

3    offering.  I identified some significant problems and    10:48

4    as a result pulled the public offering and was    10:48

5    involved in the administration of that bank for    10:48

6    approximately a year.    10:48

7    I left and rejoined First Los Angeles    10:48

8    Bank, who was considering purchasing the bank, which    10:48

9    they decided not to.  But during that period of time,    10:48

10    First Los Angeles Bank had been sold to a bank whose    10:48

11    headquarters was in Italy.  It was one of the largest    10:48

12    banks in Italy, Sanpaolo Bank, headquartered, if I    10:48

13    recollect correctly, in Turin, T-u-r-i-n, Italy.    10:48

14    I remained with First Los Angeles Bank    10:48

15    until 1993.  I was an executive vice president and    10:48

16    involved in origination, supervision of credit, as    10:48

17    well as other departmental responsibilities.  And for    10:48

18    approximately the first -- until, if I'm not -- I    10:48

19    believe it was 1991 or '92 I was also a regional vice    10:48

20    president.  My responsibilities then switched to    10:48

21    creation of additional departments, creation and    10:48

22    development of SBA lending, mortgage lending, and    10:48

23    other administrative responsibilities involving the    10:48

24    potential acquisition of other banks.    10:48

25    I left First Los Angeles Bank in 1993 and    10:48

Page 18

```
 1    then called the Robert Marston & Associates, which is      10:49

 2    now known as the RMA Association, which involved           10:49

 3    credit reporting and direct contact and a series of        10:49

 4    principals of communication, and that would involve        10:49

 5    clear and accurate disclosures and clear and accurate      10:49

 6    to the best of the availability of information in           10:49

 7    response to inquiries.                                     10:49

 8              And even back then people did have               10:49

 9    negative information sometimes arising in credit           10:49

10    databases or -- which would come about through queries     10:49

11    when we were doing investigations, and that sometimes      10:49

12    verified or -- the accuracy of information both            10:49

13    positively and negatively.                                 10:49

14         Q.   In your time at San Juan Bank of                 10:49

15    California, were you ever responsible for conducting       10:49

16    investigations as to consumer credit disputes?            10:49

17         A.   Rarely.  But I was involved with setting         10:49

18    policies and procedures from a supervisorial              10:49

19    perspective as well as from a written policy              10:49

20    perspective and would provide guidance to account         10:49

21    officers and managers and other executives of the bank    10:49

22    and also, with a review of credit applications as a       10:49

23    member of the loan committee, would relate to the         10:49

24    continuation of the bank at that time's involvement       10:49

25    with the Robert Marston & Associates and credit           10:49
```

Page 21

```
 1    inquiries association.                                    10:49

 2            There would be routinely -- I forget             10:49

 3    whether they were quarterly or semiannual -- meetings    10:49

 4    of the RMA Association, which was also known as a         10:49

 5    credit managers association, which would involve the     10:49

 6    exchange of information and setting up lines of          10:49

 7    communication to verify the accuracy of or inaccuracy   10:49

 8    of information that might have been contained in         10:49

 9    credit applications.                                     10:49

10            Q.   When you say that you were involved with    10:49

11    creating policies and procedures with regard to         10:49

12    investigation as to credit disputes, were you involved  10:49

13    in creating policies and procedures regarding the       10:49

14    reasonableness of investigations as to credit           10:49

15    disputes?                                                10:49

16            A.   Yes.  That was always a fundamental         10:49

17    issue, and the presumption was that there would be a    10:49

18    thorough investigation.  So effectively when a credit   10:49

19    investigation took place, there would be a memorandum   10:49

20    or some form of written communication that would be     10:49

21    maintained and established by the bank and placed in a  10:49

22    file.  And you can easily see who they contacted, what  10:49

23    was said, and what the question was that was of         10:49

24    potentially concern or a verification of a              10:49

25    relationship.                                            10:49
```

Page  22

1    And at that time, since it was largely    10:49

2    done on a personal basis, it was important that people    10:49

3    would know who was contacted and what was said.    10:49

4    Q.   During your time at the Bank of    10:49

5    Los Angeles, were you ever responsible for conducting    10:49

6    investigations as to consumer credit disputes?    10:49

7    A.   I am refilling my coffee here, excuse me.    10:49

8    The answer:  Yes, ma'am.  I was the chief    10:49

9    executive officer of the bank, and I provided -- or    10:49

10    made sure that we had policies and procedures that    10:49

11    were extensive.  Among the policies and procedures    10:49

12    that we obtained, they were from, largely, other    10:49

13    banks, including Bank of America at that time and City    10:49

14    National Bank at the time with whom we had close    10:49

15    relationships.    10:49

16    They provided copies of their policies    10:49

17    and procedures, which we then integrated into becoming    10:49

18    our policies and procedures.  And each of the policies    10:49

19    and procedures that we had since we were just opening    10:49

20    were -- had to be reviewed and approved by the FDIC,    10:49

21    who were -- who was our primary regulator, and then    10:49

22    the California state banking department.  And they had    10:49

23    to also review our policies and procedures since we    10:50

24    were opening a bank, and they wanted to hopefully    10:50

25    believe that we were going to be operating on a safe    10:50

Page 23

| | | |
|---|---|---|
| 1 | identified problems but was not directly involved in | 10:50 |
| 2 | any litigation.  They were relating primarily to | 10:50 |
| 3 | compliance issues and disclosures and investigations | 10:50 |
| 4 | or claims, and then they were handled by a department | 10:50 |
| 5 | different than the department that I work with. | 10:50 |
| 6 | Q.   Okay.  You testified that you have served | 10:50 |
| 7 | as an expert witness in more than 250 and up to 500 | 10:50 |
| 8 | cases in the last 30 years with regard to the FCRA; is | 10:50 |
| 9 | that correct? | 10:50 |
| 10 | A.   Yes, ma'am.  They would then -- that | 10:50 |
| 11 | would normally arise -- excuse me -- in cases that | 10:50 |
| 12 | might not directly have been an FCRA claim but | 10:50 |
| 13 | indirectly resulted from incorrect reporting or | 10:50 |
| 14 | inaccurate reporting. | 10:50 |
| 15 | Now, whether that was a direct claim or | 10:50 |
| 16 | not a direct claim, the FCRA issues did frequently | 10:50 |
| 17 | arise. | 10:50 |
| 18 | Q.   How many times have you served as an | 10:50 |
| 19 | expert on a claim that directly involved the FCRA? | 10:50 |
| 20 | A.   I can't give you a direct number.  It | 10:50 |
| 21 | spanned a long period of time. | 10:50 |
| 22 | Q.   Can you give me a range, an estimated | 10:50 |
| 23 | range? | 10:50 |
| 24 | A.   Yes, ma'am.  Directly, at least more than | 10:50 |
| 25 | a hundred. | 10:50 |

Page 25

1    Q.    Okay.  And on these more than hundred    10:50

2    cases in which you served as an expert witness on a    10:50

3    direct FCRA claim, were they on the plaintiff side or    10:50

4    the defense side?    10:50

5    A.    They have -- to the best of my    10:50

6    recollection, I can't -- I have been prime -- I can't    10:50

7    recollect an instance in which I was adverse to a    10:50

8    consumer.  In other words, when you say plaintiff or    10:50

9    defendant, there might have been cross-claims or    10:50

10    litigation where the consumer was either the plaintiff    10:50

11    or the defendant.    10:50

12    So I think it's clearer in response to    10:50

13    your question to state that it's, to the best of my    10:50

14    recollection, been virtually always on the side of the    10:50

15    consumer.  And I've even received calls from people in    10:50

16    your firm over the years and told them, whoever it    10:50

17    was, that I'm not their guy; I would have a conflict    10:50

18    given the cases that I was involved with and prior    10:50

19    testimony, that it would be inappropriate for me to be    10:50

20    retained.    10:50

21    Q.    And do you have an approximate of how    10:50

22    many times you've been deposed before?    10:50

23    A.    I can't give you a number.  You have more    10:51

24    than 300 cases, many of which involve depositions and    10:51

25    appearances in either trial or arbitration.  Far more    10:51

Page 26

| | | |
|---|---|---|
| 1 | scores and credit reports.  I did look at the Consumer | 11:05 |
| 2 | Banking and Payments Law manual, 6th Edition, by the | 11:05 |
| 3 | National Consumer Law Center.  I went online and, once | 11:05 |
| 4 | again, looked at the RMA, the Risk Management | 11:05 |
| 5 | Association, guidance and policies.  I looked at the | 11:05 |
| 6 | Union Bank of California lender liability.  I did | 11:05 |
| 7 | briefly look at the FDIC.  I have it listed as DSC | 11:05 |
| 8 | Risk Management Manual of Examination Policies. | 11:05 |
| 9 | That could be easily obtained, as I'm | 11:05 |
| 10 | sure you're aware, going online, typing in "FDIC Risk | 11:06 |
| 11 | Management Manual of Examination Policies." | 11:06 |
| 12 | And I did, once again, relook at the 40 | 11:06 |
| 13 | years of experience with the Fair Credit Reporting Act | 11:06 |
| 14 | and FTC staff report.  That can be obtained online by | 11:06 |
| 15 | typing in "40 years of experience with the Fair Credit | 11:06 |
| 16 | Reporting Act and FTC staff report."  That's available | 11:06 |
| 17 | through a Google search.  And the RMA, Risk Management | 11:06 |
| 18 | Association, Code of Ethics.  That, too, can be | 11:06 |
| 19 | obtained online through a Google search, and I looked | 11:06 |
| 20 | at that once again. | 11:06 |
| 21 | Q.   Okay.  Did you review any hearing | 11:07 |
| 22 | transcripts from the AAA arbitration that took place | 11:07 |
| 23 | prior to this federal lawsuit? | 11:07 |
| 24 | A.   No, ma'am.  The first I saw was it was as | 11:07 |
| 25 | part of your production this morning. | 11:07 |

Page 36

| | | |
|---|---|---|
| 1 | Q.  Do you believe you received all the | 11:07 |
| 2 | documents that you needed to be able to form the | 11:07 |
| 3 | opinions that you provided in this matter? | 11:07 |
| 4 | A.  Yes, ma'am. | 11:07 |
| 5 | Q.  Other than speaking with Plaintiff and | 11:07 |
| 6 | reviewing the documents that you went through, did you | 11:07 |
| 7 | do anything to prepare for this deposition today? | 11:07 |
| 8 | A.  No, ma'am.  Well, other than speaking | 11:07 |
| 9 | with Mr. Johnson. | 11:07 |
| 10 | Q.  Yes. | 11:07 |
| 11 | A.  And I did not speak with anyone else | 11:07 |
| 12 | concerning -- could we -- | 11:08 |
| 13 | Q.  How long did you take to prepare for your | 11:08 |
| 14 | deposition today?  How long did you take to prepare | 11:08 |
| 15 | for your deposition today? | 11:08 |
| 16 | A.  I would estimate approximately ten hours. | 11:08 |
| 17 | Q.  Is it your practice to specifically track | 11:08 |
| 18 | the time that you expend in connection with your | 11:08 |
| 19 | expert services? | 11:08 |
| 20 | A.  Yes, ma'am. | 11:08 |
| 21 | Q.  Did you specifically track the amount of | 11:08 |
| 22 | time that you took to prepare for your deposition | 11:08 |
| 23 | today? | 11:08 |
| 24 | A.  Yes, ma'am. | 11:08 |
| 25 | Q.  And did you write down that number? | 11:08 |

Page 37

| | | |
|---|---|---|
| 1 | A.   Yes, ma'am. | 11:08 |
| 2 | Q.   Okay.  So I'd like to introduce | 11:08 |
| 3 | Exhibit 2, which is the deposition subpoena you | 11:08 |
| 4 | received in this case. | 11:09 |
| 5 | (Deposition Exhibit 2 was marked.) | 11:09 |
| 6 | A.   Let me close this -- well, I'll leave | 11:09 |
| 7 | that there.  If you can just give me one second, | 11:09 |
| 8 | please. | 11:09 |
| 9 | Q.   (BY MS. GNANADESIGAN)  No problem. | 11:09 |
| 10 | A.   I've printed that.  I have the original | 11:09 |
| 11 | here, so I just pulled that out.  Yes, ma'am. | 11:09 |
| 12 | Q.   So if you'll see the attachment on the | 11:09 |
| 13 | deposition subpoena, which is on page 2 of four total | 11:09 |
| 14 | pages? | 11:09 |
| 15 | A.   Yes, ma'am. | 11:09 |
| 16 | Q.   You'll see that there are five document | 11:09 |
| 17 | requests; is that correct? | 11:09 |
| 18 | A.   Yes, ma'am. | 11:09 |
| 19 | Q.   And Mr. Johnson forwarded an email to me | 11:09 |
| 20 | that you sent to him that stated "Due to the time that | 11:09 |
| 21 | had elapsed between the time that you wrote your | 11:09 |
| 22 | report and the time you received the subpoena, you had | 11:09 |
| 23 | destroyed your files with regard to this engagement"; | 11:09 |
| 24 | is that correct? | 11:10 |
| 25 | A.   Yes, ma'am. | 11:10 |

Page 38

| | | |
|---|---|---|
| 1 | Q.   And is that your typical practice? | 11:10 |
| 2 | A.   I explain in my email.   I presume you | 11:10 |
| 3 | have a copy of it. | 11:10 |
| 4 | Q.   I do.   And what is your typical practice | 11:10 |
| 5 | in terms of how long you retain documents associated | 11:10 |
| 6 | with your engagement as an expert in matters? | 11:10 |
| 7 | A.   My practice is if I believe the case has | 11:10 |
| 8 | been closed or I've not been involved or contacted for | 11:10 |
| 9 | approximately a year, I normally will destroy, that | 11:10 |
| 10 | is, have the file shredded, since -- I don't recollect | 11:10 |
| 11 | if there was, but I would presume in a case like this | 11:10 |
| 12 | there would have been a protective order.   So I will | 11:10 |
| 13 | personally rip up and shred and destroy the documents | 11:10 |
| 14 | that have been provided. | 11:11 |
| 15 | Q.   You were never advised that the case had | 11:11 |
| 16 | specifically been closed; is that correct? | 11:11 |
| 17 | A.   No, ma'am.   But I hadn't heard anything | 11:11 |
| 18 | until, actually, the evening that I received the | 11:11 |
| 19 | subpoena. | 11:11 |
| 20 | Q.   And you were not advised of an obligation | 11:11 |
| 21 | to shred the documents that pertain to your engagement | 11:11 |
| 22 | in this case; is that correct? | 11:11 |
| 23 | A.   No, ma'am.   But as part of my normal | 11:11 |
| 24 | practice I included normally in my engagement letter | 11:11 |
| 25 | is that I will treat information private unless | 11:11 |

Page  39

| | | |
|---|---|---|
| 1 | authorized to disclose it.  So I treat it | 11:11 |
| 2 | confidentially and as if it would be protected. | 11:11 |
| 3 | So rather than pull up the FCRA manual, | 11:12 |
| 4 | for instance, that I have -- and I've seen it in other | 11:12 |
| 5 | cases with Chase.  I can't remember specifically | 11:12 |
| 6 | what -- similar policies or manual, I rip them up so I | 11:12 |
| 7 | wouldn't inadvertently use information from a prior | 11:12 |
| 8 | case in an ongoing case, because I view each case as | 11:12 |
| 9 | being -- and disclosure a specific isolated instance | 11:12 |
| 10 | and not to be revealed to others other than perhaps | 11:12 |
| 11 | what mentally I might have retained. | 11:12 |
| 12 | Q.   And I also understand that you had | 11:12 |
| 13 | computer issues since the time of your engagement, and | 11:12 |
| 14 | you do not have any copies of communications between | 11:13 |
| 15 | you and Plaintiff's former counsel, Mr. Russell; is | 11:13 |
| 16 | that correct? | 11:13 |
| 17 | A.   Correct.  But what I can say to the best | 11:13 |
| 18 | of my recollection, following the preparation of my | 11:13 |
| 19 | report, I don't recollect any communications that | 11:13 |
| 20 | might have occurred. | 11:13 |
| 21 | I have had a hospitalization, and during | 11:13 |
| 22 | that period of time I had contemplated retiring and | 11:13 |
| 23 | not continuing as an expert.  I've rethought that | 11:13 |
| 24 | after about a month of not doing the work and being | 11:13 |
| 25 | contacted by a number of counsel concerning fair | 11:13 |

Page 40

```
 1              A.   No, ma'am.  That has also been -- you had      11:45

 2     asked a question earlier, a question with respect to        11:45

 3     my testimony.  I specifically have been -- it's been        11:45

 4     raised as attempting to quantify noneconomic issues,        11:45

 5     and I cannot quantify such issues.                          11:45

 6              But I can identify, based on testimony             11:46

 7     and information provided, that they do exist, and one       11:46

 8     of those that's been accepted is credit stigma.  And       11:46

 9     that's evidenced by Mr. Johnson's reluctance to            11:46

10     attempt to refi and the impact of him not seeking          11:46

11     additional credit or use of credit cards.                  11:46

12              Q.   You testified about Mr. Johnson's             11:46

13     reluctance to seek a refinance.  Are you aware of any      11:46

14     evidence that Mr. Johnson was actually unable to           11:46

15     secure financing at any time?                              11:46

16              A.   I have not seen empirical evidence with      11:47

17     respect to him trying to obtain credit, a specific         11:47

18     declination at this moment.                                11:47

19              Q.   Are you aware of any evidence that           11:47

20     Mr. Johnson applied for and was unable to obtain any       11:47

21     new loans?                                                 11:47

22              A.   I have not seen empirical evidence.  No,     11:47

23     ma'am.                                                     11:47

24              Q.   Are you aware of any evidence that           11:47

25     Mr. Johnson had reduced access to credit?                  11:47
```

Page 51

| | | |
|---|---|---|
| 1 | A.   I have.  Access to credit specifically | 11:47 |
| 2 | with insurance and providing insurance the adverse | 11:47 |
| 3 | notices with respect to cost and increase. | 11:47 |
| 4 | There's a consumer credit scoring model | 11:47 |
| 5 | that exists for insurance purposes, and he was not on | 11:47 |
| 6 | the high end; he was on the low end.  And I have seen | 11:48 |
| 7 | documentation relative to that. | 11:48 |
| 8 | Q.   What documentation have you seen? | 11:48 |
| 9 | A.   I saw a notice that he provided to me of | 11:48 |
| 10 | a decrease -- an increase in insurance cost. | 11:48 |
| 11 | Q.   Does that notice state why there was an | 11:48 |
| 12 | increase in insurance costs? | 11:48 |
| 13 | A.   Yes, ma'am.  It goes to the insurance | 11:48 |
| 14 | scoring models, and that's why I mentioned the | 11:48 |
| 15 | insurance scoring models, which are then obtained from | 11:48 |
| 16 | CRA databases. | 11:48 |
| 17 | Q.   Are you aware of any evidence that | 11:49 |
| 18 | Mr. Johnson specifically had any lost opportunities? | 11:49 |
| 19 | A.   His testimony that he didn't purchase a | 11:49 |
| 20 | property. | 11:49 |
| 21 | Q.   Do you have any evidence that he actually | 11:49 |
| 22 | attempted to purchase that property?  Did he make an | 11:49 |
| 23 | offer on that property? | 11:49 |
| 24 | A.   That, at this moment, I cannot recollect | 11:49 |
| 25 | specifically having made.  But I would presume that if | 11:49 |

Page 52

| | | |
|---|---|---|
| 1 | he was contemplating making a purchase that he did | 11:49 |
| 2 | have information pertaining to the cost and location. | 11:49 |
| 3 | My recollection it was Pine Mountain.  I am not | 11:49 |
| 4 | specifically aware of other details pertaining to that | 11:49 |
| 5 | investment, but he would, and could, testify to that. | 11:49 |
| 6 | Q.   So you do not have any evidence that he | 11:49 |
| 7 | actually made an offer on that property; is that | 11:50 |
| 8 | correct? | 11:50 |
| 9 | A.   At this moment, I don't recollect, ma'am. | 11:50 |
| 10 | Q.   Do you know, was that factored into your | 11:50 |
| 11 | analysis in your expert report with regard to the | 11:50 |
| 12 | damages that you claim he suffered? | 11:50 |
| 13 | A.   Yes.  That was a factor that I factored | 11:50 |
| 14 | into preparing my report that -- but also other | 11:50 |
| 15 | economic damages that I don't have is the amount of | 11:50 |
| 16 | time and costs that he has spent investigating.  There | 11:50 |
| 17 | is a value to time, but there's also -- he may have | 11:50 |
| 18 | out-of-pocket costs, but I do not have a | 11:50 |
| 19 | quantification of the out-of-pocket costs. | 11:50 |
| 20 | Q.   You state in your expert report that you | 11:51 |
| 21 | will be providing an opinion as to whether or not | 11:51 |
| 22 | Chase's actions and conduct pertaining to Mr. Johnson | 11:51 |
| 23 | Ink card account were consistent with industry | 11:51 |
| 24 | standard.  Can you please discuss that opinion and | 11:51 |
| 25 | provide -- | 11:51 |

Page 53

| 1 | I mean when the executive office was preparing a | 12:01 |
| 2 | response to the CFPB complaint filed by Mr. Johnson, | 12:01 |
| 3 | it appears to me that Ms. Willis, first of all, didn't | 12:01 |
| 4 | recollect a lot of what transpired.  But also there | 12:01 |
| 5 | was no interdepartmental communication speaking | 12:01 |
| 6 | directly with the investigators or the collectors or | 12:01 |
| 7 | other departments.  It was more of a response. | 12:01 |
| 8 | And furthermore, the review of the phone | 12:02 |
| 9 | records and communications, if they -- if a thorough | 12:02 |
| 10 | investigation or reinvestigation had taken place, I | 12:02 |
| 11 | think they would have come to a different conclusion. | 12:02 |
| 12 | But she was limited in not having access to feedback | 12:02 |
| 13 | from other people. | 12:02 |
| 14 | THE DEPONENT:  Excuse me, I have my | 12:02 |
| 15 | office -- I can't turn off my phones here.  I | 12:02 |
| 16 | apologize when they ring. | 12:02 |
| 17 | A.   But she did not speak with other | 12:02 |
| 18 | departments.  And as a result of not speaking with | 12:02 |
| 19 | other departments, her -- led to misleading and | 12:02 |
| 20 | inaccurate information. | 12:03 |
| 21 | Granted, there was a charge-off, but they | 12:03 |
| 22 | would have recognized -- or should have recognized | 12:03 |
| 23 | that there was a misunderstanding that took place.  It | 12:03 |
| 24 | was a relatively small amount of money.  Mistakes do | 12:03 |
| 25 | happen, and they should have taken corrective action | 12:03 |

Page 57

```
 1    and not charged it off.                              12:03

 2            And if they had access to the phone          12:03

 3    records, I'm confident that it was commercially      12:03

 4    reasonable that they would have decided, yeah, maybe 12:03

 5    there was a mistake.  We can't verify.               12:03

 6            But with respect to receiving ACDVs that     12:03

 7    were inaccurate and not responding and saying,       12:04

 8    Granted, there's no fraud here, that would have led to 12:04

 9    them not reporting but -- and not verifying and would 12:04

10    have led to his credit report being promptly         12:04

11    corrected, which it wasn't.                          12:04

12        Q.   So you testified you believe that Chase     12:04

13    was required to conduct cross-department or          12:04

14    interdepartmental communication in order to conduct a 12:04

15    reasonable investigation under the FCRA.  Where do you 12:04

16    believe this requirement is found?                   12:04

17        A.   Yes.  Could you -- I missed the last few    12:04

18    words that you said.  Could you please repeat your   12:04

19    question?                                            12:04

20        Q.   Yes.  You testified that you believe        12:05

21    Chase's investigation required by the FCRA was not   12:05

22    reasonable because it was limited in terms of a      12:05

23    cross-department -- or interdepartment communication, 12:05

24    and you believe that that should have occurred.  Where 12:05

25    do you believe that that requirement exists?  Where is 12:05
```

Page 58

1    it found?                                                    12:05

2         A.    Just a good business practice.    How can         12:05

3    you on a commercially reasonable basis undertake an          12:05

4    investigation that would be considered to be thorough        12:05

5    if you do not speak with other departments and other         12:05

6    personnel or have access to other records that will be       12:05

7    available?  That's commercially unreasonable and not         12:05

8    logical, based on --                                         12:05

9         Q.   Are you --                                         12:05

10        A.    -- more than 50 years of experience and           12:05

11   credit investigations.  Respectfully, I don't mean           12:06

12   this argumentatively, crazy.                                 12:06

13        Q.   Are you aware of any statutes that                 12:06

14   require a cross department or interdepartmental              12:06

15   communication in order for an investigation under the        12:06

16   FCRA to be determined reasonable?                            12:06

17             MR. JOHNSON:  Objection.  Calls for a              12:06

18   legal conclusion.                                            12:06

19        A.   I can't answer from a statute.  However,           12:06

20   from a business practice and to be commercially              12:06

21   reasonable, I have found that in FCRA cases or               12:06

22   mortgage cases and cases involving consumer credit           12:06

23   that a failure to be able to speak with other                12:06

24   important parties or other departments and a                 12:06

25   limitation either on time or on request to escalate to       12:07

Page 59

| | | |
|---|---|---|
| 1 | outside of the arbitration.  That was an agreement | 12:20 |
| 2 | between Chase and I and should not be used here. | 12:20 |
| 3 | MS. GNANADESIGAN:  We can proceed. | 12:20 |
| 4 | Q.   (BY MS. GNANADESIGAN)  Mr. Tarter, have | 12:20 |
| 5 | you seen this document before? | 12:20 |
| 6 | A.   Not before this morning.  No, ma'am. | 12:20 |
| 7 | Q.   Okay.  Are you aware that Mr. Johnson had | 12:20 |
| 8 | two different online profiles with Chase? | 12:20 |
| 9 | A.   Could you please explain two different | 12:20 |
| 10 | profiles?  I don't understand. | 12:20 |
| 11 | Q.   Are you aware that he had two different | 12:20 |
| 12 | user names and accounts, online accounts, with Chase? | 12:20 |
| 13 | MR. JOHNSON:  Objection.  Form. | 12:21 |
| 14 | Misleading.  Calls for speculation. | 12:21 |
| 15 | A.   Could you restate your question? | 12:21 |
| 16 | MS. GNANADESIGAN:  Could you please read | 12:21 |
| 17 | it back. | 12:21 |
| 18 | (The question was read back as follows: | 12:21 |
| 19 | "Are you aware that he had two different user names | 12:21 |
| 20 | and accounts, online accounts, with Chase?") | 12:21 |
| 21 | A.   I am aware that he had two different | 12:21 |
| 22 | accounts at one point in time. | 12:21 |
| 23 | Q.   (BY MS. GNANADESIGAN)  Were you aware | 12:21 |
| 24 | that he had two different online profiles with Chase? | 12:21 |
| 25 | A.   I don't know -- recollect.  You're using | 12:21 |

Page 67

| | | |
|---|---|---|
| 1 | the term "profiles with Chase." I haven't heard that | 12:21 |
| 2 | definition before or explanation. So could you please | 12:21 |
| 3 | explain what do you mean by "profiles"? | 12:22 |
| 4 | Q. Do you have any online banking accounts, | 12:22 |
| 5 | Mr. Tarter? | 12:22 |
| 6 | MR. JOHNSON: Objection. Irrelevant. | 12:22 |
| 7 | MS. GNANADESIGAN: I'm trying to explain | 12:22 |
| 8 | what it means. I'm not asking him for purposes of | 12:22 |
| 9 | this for testimony about his online accounts. I'm | 12:22 |
| 10 | trying to explain to him what it means because he's | 12:22 |
| 11 | not understanding a standard-used term. | 12:22 |
| 12 | MR. JOHNSON: It's not a standard-used | 12:22 |
| 13 | term. You're using Chase-specific terminology. | 12:22 |
| 14 | MS. GNANADESIGAN: Well, he's a banking | 12:22 |
| 15 | expert; so... | 12:22 |
| 16 | MR. JOHNSON: Chase-specific terminology, | 12:22 |
| 17 | not banking. | 12:22 |
| 18 | Q. (BY MS. GNANADESIGAN) Do you have -- so | 12:22 |
| 19 | you do not understand what I mean when I say an online | 12:22 |
| 20 | profile? | 12:22 |
| 21 | A. It can have different meanings. | 12:22 |
| 22 | Q. What is your understanding of what I | 12:22 |
| 23 | mean? | 12:22 |
| 24 | A. Profile, an account, account-specific | 12:22 |
| 25 | information, and access to information that would | 12:22 |

Page 68

| | | |
|---|---|---|
| 1 | include information for privacy purposes, password | 12:22 |
| 2 | protection, and privacy-related issues and the | 12:23 |
| 3 | availability to access information would be | 12:23 |
| 4 | encompassed in what I would construe to be a profile, | 12:23 |
| 5 | which would constitute a database and access thereto. | 12:23 |
| 6 | Q.    So are you aware that Mr. Johnson had two | 12:23 |
| 7 | separate online profiles with Chase? | 12:23 |
| 8 | A.    He had two separate accounts that may | 12:23 |
| 9 | have involved different passwords.  That, I don't | 12:23 |
| 10 | know. | 12:23 |
| 11 | Q.    Okay. | 12:23 |
| 12 | A.    This is the first time I've seen this | 12:23 |
| 13 | document. | 12:23 |
| 14 | Q.    Okay.  And are you aware that Mr. Johnson | 12:23 |
| 15 | had a separate and unique user ID and online profile | 12:23 |
| 16 | which was JSJohnJohns3 to access his Ink card | 12:23 |
| 17 | statements via Chase.com? | 12:24 |
| 18 | A.    That, I don't recollect. | 12:24 |
| 19 | Q.    Okay. | 12:24 |
| 20 | A.    And again, this is the first time I've | 12:24 |
| 21 | seen this document. | 12:24 |
| 22 | Q.    So this was not provided to you by | 12:24 |
| 23 | Mr. Johnson, correct? | 12:24 |
| 24 | A.    Correct. | 12:24 |
| 25 | Q.    This was not provided by Mr. Johnson's | 12:24 |

Page 69

```
 1              THE VIDEOGRAPHER:  We're back on the       01:02

 2     record at 1:02.                                     01:02

 3          Q.   (BY MS. GNANADESIGAN)  Mr. Tarter,        01:02

 4     earlier you testified that in preparing your expert 01:02

 5     report and in creating your opinions that you relied 01:02

 6     on Chase documents; is that correct?                01:02

 7          A.   I did.                                    01:03

 8          Q.   Okay.  Have you reviewed any emails from  01:03

 9     Chase to Johnson or any records regarding emails from 01:03

10     Chase to Johnson that talked about how his credit card 01:03

11     statement is available online?                      01:03

12          A.   I don't recollect, ma'am.  I may have.    01:03

13     If that was in the original document production, I did 01:03

14     read it.  If it wasn't in the original document     01:03

15     production, I don't recollect seeing any email.     01:03

16          Q.   Have you -- do you recall reading any     01:03

17     documents that talked about Chase advising a customer 01:03

18     that they would not stop receiving statements if they 01:03

19     closed their account?                               01:03

20          A.   No, ma'am.  I don't.                      01:03

21               As a general practice, I have seen        01:04

22     instances if a customer had closed an account or had 01:04

23     allegedly been paid off or sold or transferred, they 01:04

24     were still able to obtain historic records, which   01:04

25     would include account statements.                   01:04
```

Page 83

1    Q.    Are you aware that Mr. Johnson was    01:04

2    receiving account statements emails from Chase up    01:04

3    through April 2018?    01:04

4            MR. JOHNSON:    Objection.    Vague and    01:04

5    misleading.    01:04

6        A.    I recollect that there may have been a    01:04

7    statement.    I don't recollect how many or if he    01:04

8    actually -- I do recollect specifically that    01:04

9    Mr. Johnson wanted and was an online banker, so to    01:05

10    speak, and relied on online statements.    01:05

11        Q.    (BY MS. GNANADESIGAN)    Were any of the    01:05

12    Chase online statements that were provided to    01:05

13    Mr. Johnson used to form the basis of your opinions?    01:05

14            MR. JOHNSON:    Objection.    Vague.    01:05

15    Misleading.    Misstates the record.    01:05

16        A.    I relied on his communication and the    01:05

17    documents that I had received at that point in time    01:05

18    and my communications with him and Mr. Russell.    01:05

19        Q.    (BY MS. GNANADESIGAN)    So you do not    01:05

20    specifically recall whether any communications between    01:05

21    Chase and Mr. Johnson were used to form the basis of    01:05

22    your opinions?    01:06

23        A.    When you say -- did you say online or    01:06

24    written?    I didn't understand your question.    01:06

25        Q.    Okay.    01:06

Page 84

| | | |
|---|---|---|
| 1 | A.    Clarity, please. | 01:06 |
| 2 | Q.    Do you have a recollection specifically | 01:06 |
| 3 | as to whether any of the online communications between | 01:06 |
| 4 | Chase and Mr. Johnson were used to form the basis of | 01:06 |
| 5 | your opinions that you provided in your expert report? | 01:06 |
| 6 | MR. JOHNSON:   Objection.   Vague. | 01:06 |
| 7 | Misleading.   What is "online communications"? | 01:06 |
| 8 | A.    That's what I was going to ask.   I wasn't | 01:06 |
| 9 | clear, ma'am. | 01:06 |
| 10 | Q.    (BY MS. GNANADESIGAN)   Do you have a | 01:06 |
| 11 | specific recollection as to whether any emails sent | 01:06 |
| 12 | from Chase to Mr. Johnson regarding the availability | 01:06 |
| 13 | of his credit card statements were used to form the | 01:06 |
| 14 | basis for your opinions in your expert report? | 01:07 |
| 15 | A.    I don't recollect if I used any | 01:07 |
| 16 | communications or emails from Chase to Mr. Johnson. | 01:07 |
| 17 | Q.    And today you're not aware of any | 01:07 |
| 18 | specific emails from Chase to Mr. Johnson regarding | 01:07 |
| 19 | the availability of his credit card statements online | 01:07 |
| 20 | for his Ink business card account? | 01:07 |
| 21 | A.    At the moment I don't recollect, ma'am. | 01:07 |
| 22 | (Deposition Exhibit 5 was marked.) | 01:07 |
| 23 | Q.    (BY MS. GNANADESIGAN)   Can we turn to | 01:08 |
| 24 | Exhibit 5, please. | 01:08 |
| 25 | A.    Yes, ma'am.   Let me close this.   It takes | 01:08 |

Page 85

1    what you're supposed to be doing.  So I'm not taking                01:24

2    fault with how you're answering.                                    01:24

3            A.    Thank you.  Nor with the way you're                   01:24

4    asking your questions.  But consistent with what we                 01:24

5    were talking about earlier, if I don't recollect, I'm               01:24

6    not going to speculate.  This is too important.                     01:24

7                And at trial, the document -- any                       01:24

8    document that would be pertinent, would be produced                 01:24

9    and, normally, to present to the jury and to the judge              01:24

10   for their consideration.  So I could at that moment                 01:24

11   re-recollect and have my memory further refreshed.                  01:25

12                Again, I wasn't aware that the case was                01:25

13   still continuing until a document server showed up at               01:25

14   my door, which I almost didn't answer because it was                01:25

15   dark outside, and we have a practice at our home not                01:25

16   to open the door.  But he identified himself and what               01:25

17   he was doing.  And as a courtesy, not knowing where it              01:25

18   was coming from, I opened the door and accepted the                 01:25

19   service.  And then went into my records to recollect                01:25

20   and refresh my mind and -- to see what documents I had              01:26

21   retained in my files.  And among the documents in my                01:26

22   files was a draft report, something on credit scores,               01:26

23   and the information that I provided to you.                         01:26

24           Q.    Thank you, Mr. Johnson [sic].                         01:26

25                Moving on, based on your experience, when              01:26

                                                            Page 96

1    retained by Veritext.  Going off the record.  The time          03:43

2    is 3:44.                                                        03:43

3                    WHEREUPON, the foregoing deposition was

4    concluded at 3:44 p.m.

5                        * * * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 165

1       I, THOMAS A. TARTER, the deponent in the above

2   deposition, do hereby acknowledge that I have read the

3   foregoing transcript of my testimony and state under

4   oath that it, together with any attached Amendment to

5   Deposition pages, constitutes my sworn testimony.

6   _____  I have made changes to my deposition.

7   _____  I have NOT made any changes to my deposition.

8

9

                    _____

10                  THOMAS A. TARTER

11

12          Subscribed and sworn to before me this

13   _____ day of _____, 20_____.

14

15

16          My commission expires:_____

17

18                          _____

                            Notary Public

19

20                          _____

                            Address

21

22

23

24

25

                                            Page 166

```
1                    REPORTER'S CERTIFICATE
2     STATE OF COLORADO            )
                                   )  ss.
3     CITY AND COUNTY OF DENVER    )
4                   I, KIRSTEN M. THORNGATE, a Registered
5     Professional Reporter, do hereby certify that previous
6     to the commencement of the examination, the witness
7     was duly sworn or affirmed by me to testify to the
8     truth.
9                   I further certify that this deposition
10    was taken in shorthand by me at the time and place
11    herein set forth and thereafter reduced to a
12    typewritten form; that the foregoing constitutes a
13    true and correct transcript.
14                  I further certify that I am not related
15    to, employed by, nor of counsel for any of the parties
16    or attorneys herein, nor otherwise interested in the
17    result of the within action.
18
19    Date: 12/18/25
20
21
                         Kirsten M. Thorngate
22                       Registered Professional Reporter
23
24
25
                                              Page 167
```

1    JOSHUA JOHNSON, ESQ.

2    josh@jj88.org

3                                        December 18, 2025

4    RE: Johnson, Joshua v. JP Morgan Chase Bank, N.A.

5    12/4/2025, Thomas A. Tarter, (#7781512).

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, noting the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20       Contact Veritext when the sealed original is required.

21    __ Waiving the CA Code of Civil Procedure per Stipulation of

22       Counsel - Original transcript to be released for signature

23       as determined at the deposition.

24    __ Signature Waived - Reading & Signature was waived at the

25       time of the deposition.

                                                    Page 168

1    _X_Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF

2       Transcript - The witness should review the transcript and

3       make any necessary corrections on the errata pages included

4       below, noting the page and line number of the corrections.

5       The witness should then sign and date the errata and penalty

6       of perjury pages and return the completed pages to all

7       appearing counsel within the period of time determined at

8       the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested - Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 169

```
 1   Johnson, Joshua v. JP Morgan Chase Bank, N.A.

 2   Thomas A. Tarter (#7781512)

 3               E R R A T A  S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____      _____

24   (Thomas A. Tarter)                        Date

25
```

Page 170

EXHIBIT C

## Johnson v Chase Hearing on 6-8-21

| Time | Speaker | |
|------|---------|---|
| | | |
| 00:04:34 | Arbitrator Charles Holton ("Arbitrator") | Hello, hello, hello. |
| | Joshua Johnson ("Johnson") | Good morning. |
| | Arbitrator | Hi, Mr. Johnson. I'm glad you made it on. Did you have any difficulty? |
| | Johnson | Hi there. Yeah, no I don't think so. I think I'm good to go. |
| | Arbitrator | Excellent. |
| | Johnson | Can you hear me? |
| | Arbitrator | All right. Well, I think we're waiting on counsel and we can get going. We're waiting – Mr. Johnson, I expect you will have some exhibits you want to show to me. Are you familiar with how to share screen on a Zoom call? |
| | Johnson | It's ah, it's been a minute but I think – |
| | Arbitrator | Unmute. |
| | Johnson | I gotta figure the mute out first. Yeah, I should be able to handle it. |
| | Arbitrator | Okay. Great. |
| | Johnson | Let me do a dry run here. |
| | Arbitrator | Yeah. |
| | Johnson | Okay. I need to leave the app. I'll be right back. |
| | Arbitrator | Okay. |
| | Johnson | How's this? Can you see my screen? |
| | Arbitrator | Yeah, it came up fine. |
| | Johnson | All right. Great. |
| 00:07:26 | Arbitrator | Mr. Cho, have you been in communication – oh there he is, never mind. Good morning, Mr. Hickey. Is everybody here that we are expecting to be participating? Let me ask it this way, is there anybody not here that we need to wait for? Okay, great. Mr. Johnson, at the walk-through that we did yesterday afternoon, Mr. Cho whom you see there on the screen introduced himself and mentioned that he had been a former student at Duke Law School and may have been a student of mine back in 2005. Is that what you said, Mr. Cho? |
| | Mr. Cho | Yes, that's when I graduated. |
| | Arbitrator | Okay. I don't remember him. And he's not sure if he remembers me. But I wanted to communicate that on to you just to make sure that you did not have any objection or concern about that. We have not had any contact since his time at Duke Law School. I was teaching only as an adjunct professor at the time. I was not a full-time profession. Do you have any problem with that? |
| | Johnson | Well, I went to NC State so I won't hold that against Steve, but no, no objection. |
| 00:09:28 | Arbitrator | Okay, great. Okay. Mr. Johnson, I know you're not a lawyer but you've certainly demonstrated some good organizational skills in putting things together. But I don't know – have you ever conducted or attended an arbitration hearing before? |

## Johnson v Chase Hearing on 6-8-21

| | | |
|---|---|---|
| | Mr. Cho | That's correct. I'm here to observe. |
| | Arbitrator | Okay. And Mr. Johnson, I assume you are. So let me ask Mr. Johnson, Ms. Wade and Ms. Kapecki to raise your right hand and I'll administer an oath to you.<br>Do you solemnly swear that the testimony you are about to give in this hearing will be the truth and the whole truth and nothing but the truth? |
| | Johnson | Yes. |
| | Ms. Kapecki ??? ("Kapecki") | I do. |
| | Ms. Wade ??? ("Wade") | I do. |
| | Johnson | I do. |
| | Arbitrator | Very good. All right. Well, Mr. Johnson, the case is with you. Proceed as you see fit. |
| 00:17:24 | Johnson | Okay. Um. So I have a bit of an opening statement that I'd like to read first if that's all right. |
| | Arbitrator | That's fine. And I would say that I have read through everything that both sides have submitted up to this point. I haven't paid close attention to the exhibit materials but I have read the pre-hearing briefs and re-read the amended pleadings. |
| | Johnson | Okay. Actually let me close – I think my camera is bugging out here. Okay.<br>Okay. So everything I am going to present is – I'll show my screen with the exception of this statement. So. Just want to kind of start out and give a summary I think of the case as I see it. Some of this, like you said Mr. Holton, you've already I think seen the briefs and the complaint. Some of this may be redundant but I'll just go ahead with what I've got written.<br>So I opened a credit card account with Chase in 2017. I opened it because Chase advertised a promotion of some sort if I remember. I think $500 in some sort of reward points in exchange for spending a certain amount of money on the card. So I opened the card. At that point, I had been a Chase customer for seven years. I had an excellent credit score. And so the two of us, Chase and myself, we agreed to an express written contract, which is the business part agreement that's entered into evidence. So in that contract, Chase – it made a number of promises. Chase promised that I would receive monthly billing statements. Separately Chase explained that those statements were the official record for the account as opposed to telephone statements. Chase also promised they would apply payments to my account as requested. So Chase did not live up to those obligations. I had trouble receiving statements shortly after I opened the card. And although I had no contractual obligation to, I made a good faith effort to discuss my inability to view those statements with Chase.<br>Chase was not helpful. So eventually I grew frustrated with my continued inability to view statements. I knew they were the official record, and I was worried that I would damage my excellent credit given how difficult it was to remember what I owed and when I owed on the card with no record.<br>So on the phone with Chase after this period of frustration, I asked that – I instructed Chase to pay the balance in full on the card and to close the |

## Johnson v Chase Hearing on 6-8-21

| | | |
|---|---|---|
| | Arbitrator | I do. |
| | Johnson | Okay. So the pertinent text here is the subtitle under paying us back. You will receive the billing statement if one is required each month. That's the sentence that matters. Will is the key word here. Will implies promise. Billing statement suggests a statement. It's not a statement notification. It's a statement as that's defined typically under the Fair Credit Billing Act but presumably elsewhere that I'm not aware of. And then if one is required I think is important to note here too. I'm not quite sure what the intent was with that language in here. It's not defined anywhere else. But I will assume kind of for sake of this case that a billing statement from Chase's perspective is required if there is a balance on the account. And I'm basing that on the fact that statement notifications were sent from when the account was opened through when the account was closed and continuing when the account was charged off. So that's I think the most important piece of the contract to note here is that Chase had established a promise to insure that I received billing statements, not a weak promise where Chase would you know make billing statements available on their online portal and I had some sort of contractual obligation to you know remember password and user ID and make sure I logged in. This was a stronger statement than that. |
| | Arbitrator | Let me ask you some questions there just to get some context. You opened this account, you started making payments on it, right, you made some payments anyway, right? |
| | Johnson | Yes, sir. |
| | Arbitrator | And what was the basis on which you made those payments? Did you get statements in some form or fashion? |
| | Johnson | So there was a – there were two periods while the account was open. And I will say this is not from memory. This is based on the record. There was a period from January until April where I'll be honest, I'm not sure. |
| | Arbitrator | 2017? |
| | Johnson | 2017, yep. |
| | Arbitrator | So you made payments in that time but you're not sure based upon what? |
| | Johnson | So all the payments that were made with the exception of one in the record where it's ambiguous were made by telephone. And so if I made them by telephone, I would have or could have been told the balance over the phone. And those calls were inbound. So my recollection is that Chase proactively called me and said you owe this balance and then I paid on the phone. |
| | Arbitrator | So in that period, January to April 2017, you're not sure whether or not you either received or saw actual statements summarizing the charges? |
| | Johnson | I do not recollect ever seeing a statement for this account. I don't recollect it now and that's consistent with my statements two-three years ago in 2018 when I presumably had a stronger memory of 2017. There's a separate issue here which is in my original claim – across all the claims, I said that I saw a zero dollar balance when I logged in. At the time I made that statement, I don't remember if it was clear that there were actually – there apparently were two Chase online accounts. There was one that had two of my Chase credit cards and there was a separate account that was extensively linked to this card. And in hindsight, I don't know if I was logging into the wrong account and seeing zero dollars and it was linked to |

Case 2:22-cv-06718-AB-MAA     Document 105-2     Filed 01/02/26     Page 102 of 115
Page ID #:1687
**Johnson v Chase Hearing on 6-8-21**

| | | |
|---|---|---|
| | | a different card. All I can say definitively is that I have no recollection of ever receiving a statement, and there is evidence from April forward that I could not have received a statement, that it was impossible for me to have done that. |
| | Arbitrator | Okay. So you did have the capacity I guess would be the right word to log in to a Chase account website but you're not sure whether you ever logged in to the website that was related to this particular business card, is that what you're saying? |
| 00:49:24 | Johnson | Yes. I cannot say that definitively. What I believe happened was that I logged in and I didn't see any – I believe I logged in, I logged into the correct account and I just did not see the card present. I have a screen shot taken in 2018 of my memory of what the online system looked like in 2017 originally. However, I will preface that, qualify that by saying when I took that screen shot, the account was charged off. And I don't know if that alters the way the screen looks. |
| | Arbitrator | I understand. What would prompt you then to make payments during the January to April timeframe of 2017? |
| | Johnson | So I was using the card. So I had – I may not have had a – you know, I didn't have a side spreadsheet where I was keeping track of my expenses, but I had a – you know, I knew that I owed something. And I do not remember if I reached out to Chase and called and attempted to pay or if they called me first. It was in the context of a telephone call with Chase. |
| | Arbitrator | Okay. Do you think that they called you just because you had a balance that was over a month old? Just from my personal experience, that's unusual that you would get a call on that basis. Or do you think it's more likely that you called them knowing you had something but just wanted to find out what? |
| | Johnson | I don't know. My um, my memory is going to be biased by the fact that I've seen the records which show that the calls were incoming. |
| | Arbitrator | Okay. We'll get more then when we see about that. But anyway, you would call or you would at least communicate on the telephone and you would authorize payment over the telephone, is that right? |
| | Johnson | Correct. |
| | Arbitrator | And how would you authorize that payment, what would you do to do that? |
| | Johnson | If my memory serves me, it was a similar process to what is recorded in the single call transcript that's an exhibit. I can bring that up now if you'd like or just explain verbally. |
| | Arbitrator | Just explain it to me, what you think is the likely way that you did it. Did you give them a checking account number, is that what you done? |
| | Johnson | So the checking account number was already linked to the account. And I don't know how I did that, if I at some point early in the life of the account I was able to log in online, I probably put it in there. I may have registered it over the phone. Yes, the conversation would go, if I remember correctly, you know you we X amount of dollars and I would go okay I would like to pay that over the phone right now. They would go so you're authorizing me to withdraw X dollars from checking account 6234, and I would say yes. |
| | Arbitrator | Okay. Okay. Very good. Now you say that this ended as of April 2017. Why did it end at that time, this way of doing business with Chase? |

## Johnson v Chase Hearing on 6-8-21

| | | |
|---|---|---|
| | Hickey | Okay. And then you could see a statement was due and you either – apparently you went to Chase.com and saw your statement there. Is that what happened? Or would you follow the link? |
| | Johnson | Would I follow the link in the statement available online? If you're asking if I continuously clicked on these statement is available online, click to Chase.com and tried to log in, which – no, I did not do that every time I got a statement is available online email. Absolutely. |
| | Hickey | Okay. So your last log on was April 4th. And then when I was asking you about your ability to log on after April 4th, you said I don't know about my ability to log on between April 4th and what period was that? |
| 04:27:46 | Johnson | Um, okay, so – I'm sorry, the question one more time. |
| | Hickey | Okay. You logged in – |
| | Johnson | April 4th. |
| | Hickey | Your last log in was April 4th. Correct? |
| | Johnson | Yep. |
| | Hickey | Okay. And your last – and then I believe you testified – and if I'm wrong, please correct me – I believe you testified that you don't know about your ability to log on after April 4th, and then you identified another – there was a period I believe you identified. |
| | Johnson | All I can say with absolutely certainty is between April 4th and September 6th when the card was closed I was frustrated, I couldn't see statements, and assuming my pattern held as it had in the past, I engaged with Chase support or you know whoever picks up the phone with Chase – |
| | Arbitrator | Let me follow up on that because I'm a little confused too. I hear what you're saying just now, but I also noted that you said a few minutes ago that you could not say that you tried to log in with your password after April 4, 2017. So if – I'm trying to figure out why were you so frustrated if you can't say that you actually tried to log in with your password. |
| | Johnson | Um, okay let me put it like this. If I log in – if I'm unable to log in with the password that I know or I'm able to log in and I don't see a balance, and that pattern persists for several months, and there's no change in the status quo, like Chase doesn't say oh we changed your password or you have a different account or something, I would still be frustrated and assume that nothing has changed. I probably – I would call them. And if they continued to not give me support, I don't, you know, if the call ended with frustration where we weren't moving the ball forward, I don't know if I would – I doubt I would try, go try and – I wouldn't try and log in unless there was a good reason to try and – the reason last time would be different I guess. |
| | Arbitrator | I understood you to say earlier that you couldn't say actually that you had tried to log in with your password after the April 4, 2017, log in. Did I misunderstand you or did you misspeak or is that your testimony? |
| | Johnson | You said that I testified that I could not log in? |
| | Arbitrator | Could not log in. That you had not tried – that you could not say that you had tried to log in with your password. |
| | Johnson | Okay. So, I don't know the specifics as far as logging in versus logging into the wrong account and seeing a zero dollar balance. I don't know – the only thing I know for certain is that I could not see statements and I tried to during that period. And beyond that, like it's – I know you're both looking for specificity, but I don't know. |

## Johnson v Chase Hearing on 6-8-21

| | | |
|---|---|---|
| | Arbitrator | Okay. How many different Chase accounts did you have in that time period from April to September 2017? |
| | Johnson | Accounts as in credit card accounts or as in – |
| | Arbitrator | Yes. Well, accounts for Chase to which you might log in. Let's put it that way. Whether credit card or checking or whatever. |
| | Johnson | Um, just – well, I've had – I know after the fact that I had two Chase online accounts for which personal was linked to one and this card is linked to another. At the time, I don't know if I knew that. Clearly I created one way back in January. I don't know. I have no idea. |
| | Arbitrator | Okay. |
| | Johnson | This was why I was seeking technical support. I didn't know. |
| | Arbitrator | Did you have a checking account or any other type of account besides credit cards with them? |
| | Johnson | No. |
| | Arbitrator | Do you know if you used different passwords for the two accounts that you did have, the personal and the business? |
| | Johnson | Um, no, I really have no recollection. I use a password manager and, you know, use it through that, so I don't know. |
| | Arbitrator | Okay. Okay, go ahead, Mr. Hickey. |
| 04:32:22 | Hickey | Thank you. |
| | Johnson | Well, you know, I'm a software engineer. I think it's unlikely that I failed to figure out how to log in in such a way that someone else would have figured out the [??]. |
| | Hickey | Okay. Thank you. So, looking at – we can go back to the emails, Josh. If you can go to page 263. Okay. So this is an email to you from Chase and so what did you – you changed your address with Chase online? |
| | Johnson | So, again, I am as much in the dark about this stuff as everybody else is with the exception of my efforts to view the statements. So, based on the record, I assume that on the 4th I logged and I updated address information. I mean that's the only consistent way to read all of the different bits and pieces of – but, who knows, maybe I was on the phone with Chase and that comes through as Chase online, I just – I truly don't know. |
| | Hickey | But would that be when you moved to 308 S. Blount to your apartment? |
| | Johnson | Four four, um, I'd have to look in my records. I'm not sure. I was in, let's see, I was at 11 on Foxfield Drive, I moved to Blount Street before Fox Glove sold, and then I moved from Blount Street to St. Mary's before the lease for Blount Street was up. So, it's – I had access to two properties at certain times. It's difficult for me to say when I did or did not have access to a place outside of like a leasing ending. Clearly I had lost access at that point. |
| | Hickey | Okay. Let's cover this issue now because you have certainly moved around quite a bit. I personally have no problem with that other than it may have had inaccessibility to reach you I guess. So when you applied to the card you were living at 1109 Fox Glove, correct? |
| | Johnson | In January. I haven't thought deeply about that day for this. So I'd have to look back. Sounds right. |
| | Hickey | But during – let's call this the life of this card. So the life of this card runs from January 2017 through I guess we'll take the charge off date of April and subsequent events, but during the course of that time period, you |

# EXHIBIT D

Arbitrator ([00:00:02](#)):

And it's recording now, Mr. Hickey has asked for access to the recording. Mr. Johnson, what do you say about that at this point in time?

Josh ([00:00:16](#)):

I maintain my objection.

Arbitrator ([00:00:18](#)):

Okay. And what's the basis if you already recorded the first hearing anyway?

Josh ([00:00:23](#)):

Yeah. So my basis is so the first recording was under different circumstances. There were constraints placed on the recording as far as the sharing of parties. Frankly, I don't think it's in my advantage to have it recorded because I think it will be used in an attempt to vacate a potential award or on an appeal. I don't think that's in my favor. And so that's the honest answer.

Joe ([00:00:48](#)):

And if I may reply to the constraints for the Mr. Johnson's recording, the first hearing certainly applied here as well. We're not going to share it outside of this proceeding. That's not our intent. And I know Mr. Johnson is concerned about appeals and action to vacate any award. I think that being a litigator, which Mr. Johnson is not, but he certainly has demonstrated a particular skillset that would make him a very good one. That's always a risk in virtually every proceeding. So the fact that I don't plan, I'd often chase plans and move to vacate anything or appeal anything at this point because there's no ruling, but I think it's always good to have as much of a record as possible. And that's why I'm glad he actually recorded the first one. So that's all I'll say.

Arbitrator ([00:01:38](#)):

Am I correct in understanding that a transcript of the first hearing has been prepared?

Joe ([00:01:45](#)):

Our word processing has gone through it and took them more than a few days to go through it because I wanted to review it. It occurred to me last week. I was like, I do not intend to recross on areas where I am satisfied with the cross exam from the first hearing or Mr. Johnson's direct testimony. So in fact, I have a very limited area of coverage with him today.

Arbitrator ([00:02:11](#)):

Are you willing to provide a copy of that transcript to Mr. Johnson and to me?

Joe ([00:02:17](#)):

Sure. Yeah. And with the understanding it's our word processing but the benefit is you can also listen to the audio there may be a misspelling or there may be... It may not be accurate. If you have an issue, just go and listen to it. So what Sheila and our Chicago office did, she did a very credible job and I offered dinner and a drink, but it's with that understanding. Yeah we'll provide it.

Arbitrator ([00:02:45](#)):

Arbitrator ([00:19:45](#)):

It would be during redirect. I assume you still do not have any other witnesses you wish to call besides yourself. Is that correct?

Josh ([00:19:55](#)):

So that's actually a point of confusion too. I wasn't clear with as far as the Chase witnesses, I don't know if it's direct or cross. Am I allowed to just ask the questions that I want of the Chase witnesses, even though that they're on Chase's witness list and not mine?

Arbitrator ([00:20:13](#)):

Yes. You can call them as a witness in your case, if you wish. Let me ask, I know I swore of those witnesses who were here at the last time were Ms. Wade, Ms. Kopecki were both of you sworn?

Valarie Kopecki ([00:20:38](#)):

Yes.

Ms. Wade ([00:20:40](#)):

Yes.

Arbitrator ([00:20:40](#)):

Okay. Mr. Johnson, you were sworn, I'll just remind all three of you that your oaths have shelf life and they remain in effect under penalty of perjury. So with that, go ahead, Mr. Hickey.

Joe ([00:20:54](#)):

Okay. I would just like to clarify that Ms. Kopecki and Ms. Wade had been brought here for very specific purposes. Ms. Kopecki has been brought here to talk about the C3s or the system notes. We've done our best to procure information relating to this account. Again, it started out the 07891787 and the O256 account. So she is here to testify about the system notes and the purge notes and other information relating to Chase's activity, relating to the account communications with Mr. Johnson. It appears that one of the things he has from before is the recreation of calls. Chase has the shelf life on the calls that it does record calls, but it also does not preserve all calls. That's why the only call that we had related to this account, the O256 account was from August 26th 2020.

Joe ([00:21:57](#)):

Ms. Kopecki is here to talk about her interpretation of the system notes about what happened in connection with the various communications, like a call in an outbound call or incoming call, things like that. And Ms. Wade is here even though, again, the confusion over the FCRA, and he's conceded here that the information provided was accurate. So whether here or elsewhere, that would preclude him from bringing a claim under the FCRA, because that is an admission that would be binding wherever, but she's here to show Chase's good based efforts to investigate the Equifax dispute. And she's also, we've seen more than several submissions of essentially the same complaint by Josh. So she's here also to talk about the executive office element of the complaint. So there's very two limited silos about that. And beyond that, I don't know. And I will ask the witnesses to testify truthfully, if Josh asks the question of them that, I don't know that that's not my area of expertise and that's not why I've been called here today.

7

There are two online profiles that we are aware of today. One is that forepus1 created in, roughly, 2010. There's the jsjohns3 one created in February of 2017. Credit cards can be linked optionally to a online profile, it's not required but they can be linked. And what I mean by that is, for example, with the business inc card, when I applied for and was accepted and got the card in the mail, my recollection was that it was not initially available online.

Josh (01:16:41):

And the same was true in 2010, when I opened my first personal Chase credit card, which I believe was a Chase Freedom card, that hasn't been referenced. The flow was, in 2010, I got this Chase credit card, it's not linked to an online profile at all, I would get statements by mail, paper statements but by mail, I see the fault.

Josh (01:17:09):

I had to do an enrolling for online access. The first step in enrolling is to go to chase.com, click register, you provide an account number, you provide a user ID and it creates this profile. And then the profile is linked to that specific credit card. My recollection is that I did that once in 2010 and for the personal credit cards that I opened, subsequent to 2010, of which there were several, I think four or five. And again, by credit card, in this context, I'm not referring to credit card accounts, I should say, meaning I opened a Chase Freedom credit card account, I opened a Chase Sapphire credit card account. The account numbers can change.

Josh (01:17:59):

There have been four or five of those between 2010 and 2017, prior to the opening of the Inc account. I do not think the subsequent cards required any action on that part to have them linked to that online profile that was created in 2010.

Arbitrator (01:18:18):

Excuse me, a minute. Just so I can make sense of what you're saying and what Joe previously brought out. What is the relevance to the issues in this case, and I'm going to ask this of both of you, of the online profile? What difference does it make?

Josh (01:18:35):

What difference does what make?

Arbitrator (01:18:40):

Does it make? Why are we talking so much about the online profile? I'm not understanding the significance of it to the issues in this case.

Josh (01:18:48):

Okay. Here's why it's relevant. I think the fact that this is digital confuses everyone. Imagine a locked security deposit box. I have a key, I can open the box. In Chase's case, as we know today, I have the equivalent of two security boxes with different keys.

Josh (01:19:10):

The relevance here is, I contend an audio recording show that, at one point in time, I effectively created the second locked box. And then for whatever reason, I got an explanation, it appears that I no longer became aware that locked box existed. For a long period of time, in 2017, I was attempting to open the locked box that had existed since 2010, that I was aware of and expecting to find information related to the Chase Inc credit card statements in that box. And they were never in that box.

Josh (01:19:57):

And the reason, we actually don't know, it could be possible that the reason they weren't in that box is because they were being delivered to the other security deposit box. It's also possible that Chase was not delivering the Chase Inc statements to any box at all, or potentially to a third box that we're not aware of.

Josh (01:20:22):

That's relevant in the context of my good faith access attempts and log in. To access means I attempted to obtain Chase Inc information, using whatever box or boxes I knew to exist. That's different from trying to use the key on a box that I don't know exist. That's the relevance.

Arbitrator (01:20:46):

Okay, Joe, what do you have to say about that?

Joe (01:20:54):

Our contention is the relevance is actually everything he just said. He said, at some point I became unaware that the second locked box existed. I didn't know it existed. He's talking about a phantom. It's also possible that Chase was sending the emails to a separate account.

Joe (01:21:10):

On February 17th, 2017, he created an Ink business account online profile. He created a user ID, Josh, whatever it is, Josh will go through it in closing, a separate ID for that account. At some point, he became unaware of that, which is this whole proceeding, it's because he's trying to lay the blame for that at Chase's feet.

Joe (01:21:34):

He created an online profile where all people that have credit card accounts, were all people that get notifications and I've ever since the day of the first hearing in this case, I have hold everybody friend, foe advocate, anyone down the hall next to me, how do you receive notification that you have a statement due?

Joe (01:21:53):

I get an email, that email sends me to my credit card company website and I link to it. Each one, I have a Bank of America card, I have an American Express card. I have two American Express cards and each one has a separate online profile. And each one has a separate user ID and each one has a password that goes with it.

Joe (01:22:15):

# EXHIBIT E

**09/17/2021**

```
 1              AMERICAN ARBITRATION ASSOCIATION

 2

 3   An Arbitration Between:

 4

 5   JOSHUA JOHNSON,

 6             Claimant,

 7        -vs-

 8   JP MORGAN CHASE BANK,

 9             Respondent.

10   _____/

11   PAGE 1 TO 222

12                        VOLUME II

13       The Continued Arbitration Hearing

14       Taken Via Hanson Remote

15       Commencing at 10:06 a.m.,

16       Friday, September 17, 2021

17       Before Laura Steenbergh CSR-3707, RMR, CRR, RDR

18

19    Court reporter, attorneys & witness appearing remotely.

20

21

22

23

24

25
```



09/17/2021                                    Pages 2..5

**Page 2**

1   APPEARANCES:

2

3   THE ARBITRATOR:

4   CHARLES R. HOLTON, ESQ.

5

6

7   JOSHUA JOHNSON

8        Appearing in Pro Se.

9

10  JOSEPH H. HICKEY, ESQ.

11  Dykema Gossett, PLLC

12  39577 Woodward Avenue, Suite 300

13  Bloomfield Hills, Michigan 48304-5086

14  (248) 203-0555

15  jhickey@dykema.com

16        Appearing on behalf of the Respondent.

17

18  ALSO PRESENT:        Andrew Cho

19                       Valerie Kopecki

20                       Susan Wade

21

22

23

24

25

**Page 3**

1                  TABLE OF CONTENTS

2

3   Witness                                          Page

4   VALERIE KOPECKI

5   EXAMINATION BY MR. JOHNSON:                       104

6

7

8                  INDEX TO EXHIBITS

9              (Exhibits retained by counsel)

10

11  Exhibit                                           Page

12  CHASE MOTION EXHIBIT 1 October 14, Executive       13

13  Office Correspondence

14  CHASE MOTION EXHIBIT 2 Online Agreement and User   29

15  ID Excerpt

16  CHASE EXHIBIT 7 Dispute Submitted by Equifax       29

17  JOHNSON EXHIBIT 11 Online Services Agreement       39

18  CHASE MOTION EXHIBIT 3 7/8/21 E-mail               68

19  JOSH EXHIBIT 201 Complaint Investigation - 2018    112

20  JOSH EXHIBIT 202 Chase-Transcription of Call -     116

21  8-26-20

22  JOSH EXHIBIT 203 8/20 Call Transcript              121

23  JOSH EXHIBIT 204 8/27 Call Transcript              122

24  JOSH EXHIBIT 205 8/14 Document                     122

25  JOSH EXHIBIT 206 10/15 Document                    122

**Page 4**

1   JOSH EXHIBIT 207 11/19 Document                    122

2   JOSH EXHIBIT 208 10/20 Document                    122

3   JOSH EXHIBIT 209 Screenshot                        168

4   JOSH EXHIBIT 210 Screenshot- Current Chase Website 179

5   JOSH EXHIBIT 211 Screenshot - Daily Alerts         181

6   JOSH EXHIBIT 212 Screenshot - Chase Online         185

7   JOSH EXHIBIT 213 Online eSign Disclosure and       192

8   Consent Agreement

9   JOSH EXHIBIT 214 Screenshot - Frequently Addressed 199

10  Questions

11  JOSH EXHIBIT 215 Screenshot - Payment Due Alerts   204

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 5**

1   Remote Deposition

2   Friday, September 17, 2021

3   About 10:06 a.m.

4        ARBITRATOR HOLTON:  All right.  So this is day

5   two, officially, of our hearing.  There have been some

6   motions filed, and I think I have said in prior e-mail

7   correspondence that we will address the motions first

8   and then proceed with the evidence in this case.  And,

9   of course, how we proceed will be dependent somewhat on

10  how the motions are resolved.

11       So, Mr. Johnson, I think you had the motions.

12  There may be one for Mr. Hickey as well, but you go

13  ahead and go first and remind me what the motions are

14  and any argument you want to make in connection with

15  them, and then I'll give Mr. Hickey a chance to respond

16  and then we'll do vice-versa with regard to his motion.

17       MR. HICKEY:  I have a few, Mr. Holton, so --

18  that we're addressing.

19       ARBITRATOR HOLTON:  So, Josh, you're on.

20       MR. JOHNSON:  Yeah.  Let me actually pull up

21  the previous correspondence, if you don't mind.  Okay.

22  Let's see.  Actually, bear with me one more second.

23       Okay.  I think the history here is I had two

24  motions outstanding.  The first was with respect to

25  testimony of Mrs. Karla Willis or Wills, so I'll start

09/17/2021                           Pages 198..201

1    Okay.  Here is -- this is a key point,
2  statement issuance.  So Joe mentioned, like, at a
3  previous hearing, he didn't think Chase had a trait
4  secret on how statements are generated, I think.  They
5  actually do kind of.  So I scoured the Chase website.
6  And this is testimony.  I've scoured the Chase website,
7  e-mails everywhere.  I cannot find a single instance
8  where Chase enumerates the circumstances in which a
9  statement is actually issued.  And that's important
10  because I'll show evidence of this, statements can be
11  issued -- let me back up.
12    The issuance of a statement does not imply
13  payment is due.  You can receive a statement
14  notification e-mail and not have a payment due.  I know
15  this for a few reasons.  The first is -- and I'll
16  introduce these, I'll show them.  I have evidence of
17  prior statements received for other Chase accounts that
18  have a zero-dollar balance, no payment is due, but a
19  statement was issued.  Furthermore, Chase seems to go
20  out of their way to avoid making any form of affirmative
21  statements about the circumstances under which
22  statements are issued.  And it's -- I mean, it's almost
23  backhanded the way it seems to work.  The website has
24  these vague, negative statements.  For example -- and
25  this will be J214.

1    JOSH EXHIBIT 214
2    Screenshot - Frequently Addressed Questions
3    WAS MARKED BY THE REPORTER
4    FOR IDENTIFICATION
5    MR. JOHNSON:  This is a screenshot of the
6  frequently addressed questions from Chase Online for the
7  JSJOHN3 business account.  Why do I not see some of my
8  statements?  And it explains the reasons.  What's tricky
9  about this is this doesn't give you any information at
10  all.  This doesn't tell you when you will or will not
11  receive the statement; it tells you when you might not
12  receive one.  It's ultimately content free.  It adds
13  confusion because it mentions things like eligible
14  Rewards.  And so a question that I still have, that I'm
15  still unclear about is -- let me go back to Josh 4 real
16  quick.  When an account statement has much more
17  information than just transactions and your payment is
18  due -- for example, and I'm on C28 from Josh 4, there is
19  a section, Chase Ultimate Rewards Summary.  So this is a
20  Reward point balance.  I don't know if statements are
21  issued if a Reward point balance exists or not.  I still
22  don't know.  It's not disclosed on the website anywhere
23  and it's -- yeah.  So my testimony is, I am currently,
24  and was in the past, during these bank accounts'
25  lifetime and prior, I've been confused for five years

1  about when statements are issued.  It clearly doesn't
2  imply a payment is due.  And there's other
3  circumstances.  I don't know how many circumstances
4  there are or what they are.
5    ARBITRATOR HOLTON:  I noticed that it does say
6  there, the final bullet point describing -- go back --
7  describing why you don't get a credit card statement
8  that you've closed your account.
9    MR. JOHNSON:  Which is confusing.  Because in
10  this case, I continue to receive statements.
11    ARBITRATOR HOLTON:  Did you receive them or
12  were they just posted on the website?
13    MR. JOHNSON:  I'm sorry, yeah, I totally
14  misspoke.  I was delivered copies of statements in
15  October 2020.
16    ARBITRATOR HOLTON:  That was in connection
17  with the investigation?
18    MR. JOHNSON:  Yes.  And as Joe, you know,
19  mentions, I received statement notifications implying
20  that a statement is available somewhere.
21    ARBITRATOR HOLTON:  After September 15th?
22    MR. JOHNSON:  Yeah.
23    ARBITRATOR HOLTON:  September.  Okay.
24    MR. JOHNSON:  Okay.  I'm going to show the
25  evidence for statement -- the zero-dollar statements

1  quickly.
2    MR. HICKEY:  You mean from this account?
3    MR. JOHNSON:  I'm sorry?
4    MR. HICKEY:  Are they from this account?
5    MR. JOHNSON:  No.
6    ARBITRATOR HOLTON:  I think it might qualify
7  as general knowledge that you can get statements on
8  credit cards that show zero balance and still get a
9  statement.  I am aware of that.  If that's all you're
10  trying to show with it.
11    MR. JOHNSON:  That's fine.  I mean, Joe has
12  inferred in previous hearings that the statement
13  notification, it means that a payment is due and so I
14  wanted to --
15    MR. HICKEY:  I've inferred that you received
16  notifications that you've received a statement and most
17  people look at them.
18    MR. JOHNSON:  Okay.  All right.
19    MR. HICKEY:  They don't rely on some duty that
20  they don't -- that they don't have a duty to open.
21    MR. JOHNSON:  Okay.  All right.  So that's
22  great.  Okay.  So this is where UCC, okay.  This is just
23  the Online Service Agreement is a Software Licensing
24  Agreement.  And I mean, I did days of research into
25  this.  There's -- I mean, quote here is they exist in

09/17/2021                                              **Page 222**
                          **Page 222**

```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF MICHIGAN        )

 4                           ) SS

 5   COUNTY OF MACOMB         )

 6

 7            I HEREBY CERTIFY that I reported

 8   stenographically the foregoing proceedings and testimony

 9   under oath at the time and place hereinbefore set forth;

10   that thereafter the same was reduced to computer

11   transcription under my supervision; and that this is a

12   full, true, complete and correct transcription of said

13   proceedings.

14

15                    Laura Steenbergh

16

17                    Laura J. Steenbergh,

18                    CSR-3707

19

20

21

22

23

24

25
```

DYKEMA GOSSETT LLP
444 SOUTH FLOWER STREET
SUITE 2200
LOS ANGELES, CALIFORNIA 90071

**PROOF OF SERVICE**
*Joshua Johnson vs. JPMorgan Chase Bank, N.A.*
*USDC, Central District, Case No. 2:22-cv-06718-AB-MAA*

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 444 South Flower Street, Suite 2200, Los Angeles, California 90071.

On the date set forth below, I served the foregoing document(s) described as

**DECLARATION OF ABIRAMI GNANADESIGAN IN SUPPORT OF DEFENDANT JPMORGAN CHASE BANK, N.A.'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF THOMAS TARTER**

on the interested parties in this action as follows:

Joshua Johnson                           **PLAINTIFF PRO SE**
2201 5th Street, Apt. 208
Santa Monica, CA 90405

Tel: (336) 423-2594
Email: iosh@ii88.org

☒    **BY OVERNIGHT SERVICE:** I enclosed the documents in an envelope/package provided by an overnight delivery carrier and addressed to the persons at the addresses above. I placed the prepaid envelope/package, for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☒    **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address MMendoza@dykema.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on January 2, 2026, at Los Angeles, California.

_____
Mitzi Mendoza